UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| N.A., a minor who sues by and through Janet Ainsworth, his mother and next friend, and Janet Ainsworth | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 2:05-CV-740-B WO |
| DEPUTY CHRIS INABINETT, in his individual capacity, | ) ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**
**ON MOTION TO DISMISS SECOND AMENDED COMPLAINT**

After due consideration of briefs and oral arguments, the court concludes that controlling case law on the qualified immunity asserted by the Defendant, Covington County Deputy Sheriff Chris Inabinett ("Deputy Inabinett"), dictates that his *Motion to Dismiss*, filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (Doc. 22, Dec. 13, 2005), be GRANTED on the claim of Plaintiff Janet Ainsworth (Count I) and DENIED on the claim by N.A., a minor who sues by and through Janet Ainsworth, his mother and next friend. (Count II).

**I.**

**RULE 12(B)(6) STANDARD OF REVIEW**

A Rule 12(b)(6) motion challenges the legal sufficiency of a complaint, and dismissal should be granted under this rule only if the movant demonstrates beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson*,

355 U.S. 41, 45-46 (1957); *accord, Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Fuller v. Johannessen*, 76 F.3d 347, 349-350 (11th Cir. 1996).

For the threshold review presented by a Rule 12(b)(6) motion, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheur v. Rhodes*, 416 U.S. 232, 236 (1974); *accord, Swierkiewicz v. Sorema*, N.A., 515 U.S. 506, 515 (2002). When a governmental officer sued individually asserts qualified immunity, as is the case here, controlling Eleventh Circuit precedent imposes a "heightened pleading" standard for the complaint instead of Rule 8's minimal notice pleading.[1]

A dismissal motion grounded on the defendant's qualified immunity requires the court to accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Dalrymple v. Reno*, 334 F.3d 991, 994-995 (11th Cir. 2003) Only "well-pleaded facts" and "reasonable inferences drawn from those facts" should be accepted. *Oladeinde v. City of*

---

[1] *See GJR Investments, Inc. v. County of Escambia*, 132 F.3d 1359, 1367-68 (11th Cir. 1998) ("We stress at this point, . . . that the heightened pleading requirement is the law of this circuit. . . . Although the Supreme Court has held that courts may not impose a heightened pleading requirement in § 1983 cases involving municipalities, *see Leatherman v. Tarrant County Narcotics Intelligence Coordination Unit*, 507 U.S. 163, 167-68, 113 S.Ct. 1160, 1162, 122 L.Ed.2d 517 (1993), the Court specifically declined to extend its holding to cases involving individual government officials, *see id*. at 167, 113 S.Ct. at 1162, and we likewise decline to do so here."); *See Wash v. Bauer*, No. 05-10531, 2005 U.S. App. LEXIS 19395, at *5 (11th Cir. Sept. 2, 2005)("[T]here is a heightened pleading requirement when a plaintiff brings a §1983 complaint against officials acting in their individual capacities."); *Dalrymple v. Reno*, 334 F. 3d 991, 996 (11th Cir. 2003) ("[W]e must keep in mind the heightened pleading requirements for civil rights cases, especially those involving the defense of qualified immunity."); *Gonzalez v. Reno*, 325 F.3d 1228, 1235 (11th Cir. 2003); *Laurie v. Ala. Court of Crim. Appeals*, 256 F.3d 1266, 1275-76 (11th Cir. 2001); *Kyle K. v. Chapman*, 208 F.3d 3940, 944 (11th Cir. 2000); *Swanson v. Pitt*, 330 F. Supp. 2d 1269, 1281 n. 31 (M.D. Ala. 2004)(recognizing that the Eleventh Circuit employs heightened pleading standards for §1983 claims against state officials in their individual capacities).

*Birmingham*, 963 F.2d 1481, 1485 (11th Cir. 1992). "[U]nsupported conclusions of law or of mixed fact and law have long been recognized not to prevent a Rule 12(b)(6) dismissal." *Marsh v. Butler County*, 268 F.3d 1014, 1036 n.16 (11th Cir.2001). The motion should be granted if the complaint fails to allege the violation of a clearly established constitutional right. *Dalrymple v. Reno,* 334 F.3d at 995.

## II.

## FACTUAL ALLEGATIONS

This Section 1983 complaint of Fourth Amendment-barred excessive force arises from Deputy Inabinett's encounter on July 13, 2005, with a then-16 year old boy ("N.A."), whose mother ("Ainsworth") summoned law enforcement officers to their residence in response to the boy's attempted suicide. The complaint describes the minor as "a troubled young man with a diagnosed history of mental illness and instability which is largely controlled by medication", and it also reports the "well-known" fact of his mental illness to the Sheriff's Department arising from deputies' visits "on several occasions." [2]

Ainsworth's emergency call on the afternoon in question followed notice of her son's "distressed state" in his bedroom after "wrapp[ing] a belt around his neck and ...choking himself with it." Requesting that a rescue squad be dispatched immediately, she "told the 911 operator that her son had just tried to choke himself." A Red Level police officer, David Anderson, arrived first at the scene, and he "...assured the family that an ambulance was on the way, asked Janet, her husband Robert, and their son, R.A., to step out of N.A's room so he could talk with the young

---

[2]*Compl.* ¶¶ 8-9. All references to the Complaint relate to the *Second Amended Complaint* filed December 13, 2005 (Doc. 21).

3

man."[3]   Plaintiffs' account of the events which followed is critical to the legal analysis, and accordingly, it is reproduced here verbatim:

> At that time, N.A. was expressing great fear and apprehension. He was kneeling on his bed with his arms wrapped around the metal bars that made up his headboard; however, by that time, he was no longer attempting to harm himself, and he did not so attempt thereafter. (¶ 17)
>
> Anderson spoke with N.A. in a calming manner and the youth's anxiety was abating. He began to release his grip on the headboard of the bed. (¶ 18)
>
> At about that time, Janet heard another vehicle arrive. Thinking it was the ambulance, she went toward the door. (¶ 19)
>
> At that point, Inabinett entered the residence with a Taser "stun gun" drawn. (¶ 20)
>
> Janet asked that Inabinett not display the weapon as she feared the sight of it would frighten the still-fragile N.A., causing him additional distress. (¶ 21)
>
> Inabinett roughly shoved Janet aside, slamming her into a wall and badly bruising her arm. (¶ 22)
>
> Inabinett rushed into N.A.'s room, pushed past Anderson, and leaped onto N.A.'s bed. His ascent to the bed was so violent that he caused the bed to break through the flooring of the home. (¶ 23)
>
> Inabinett began beating N.A. with his fists, pummeling him on his hands, arms, back, neck, and head, causing bruises and contusions. (¶ 24)
>
> By this time, N.A. was paralyzed with fear and anxiety. (¶ 25)
>
> N.A. never attacked either officer, nor did he offer to do so. He made no aggressive moves whatsoever toward anyone. (¶ 26)
>
> Anderson was yelling, "Chris, Chris," in an apparent effort to bring Inabinett under control. N.A.'s family were watching in horror. (¶ 27)

---

[3]*Compl.* ¶¶ 10-16.

Inabinett ceased beating N.A., stood up on the bed, and fired his energy weapon point-blank range toward N.A. (¶ 28)

The two probes fired by a Taser weapon [footnote omitted] are designed to contact the clothing of a victim and carry an electrical charge to the skin over a pathway of ionized air. In this case, N.A.'s skin was punctured by the probes, and at least one of the puncture wounds later became seriously infected. (¶ 29)

> n.1 The metal probes are propelled by a charge of nitrogen gas under pressure of 1,800 pounds per square inch.

N.A. was immobilized by the five-second charge and subjected to unbearable pain. (¶ 30)

When N.A.'s disabled father protested the treatment of N.A., Inabinett put his hand on his semiautomatic service pistol in a threatening manner and said, "you better not come in here." (¶ 31)

N.A. was handcuffed and taken out of the home by Anderson and Inabinett. (¶ 32)

Inabinett told the family that he was not taking N.A. to the hospital, but was taking him to jail to be charged with obstructing a governmental operation and resisting arrest. (¶ 33)

Ultimately, however, N.A. was transported by ambulance to a hospital, treated for his injuries, and transferred to a mental health facility. (¶ 34)

### III.

### DISCUSSION

*A.  Qualified Immunity:  Analytical Standards*

Qualified immunity offers "complete protection for government officials sued in their individual capacities if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346

(11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).[4]  As explained by the court in *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002):

> The purpose of this immunity is to allow government officials to carry out their discretionary duties without fear of personal liability or harassing litigation, *see Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987), protecting from suit "all but the plainly incompetent or one who is knowingly violating the federal law." *Willingham v. Loughnan*, 261 F.2d 1178, 1187 (11th Cir. 2001).  Because qualified immunity is a defense not only from liability, but also from suit, it is "important for a court to ascertain the validity of a qualified immunity defense as early in the lawsuit as possible."  *GJR Invs., Inc. v. County of Escambia*, 132 F.3d 1359, 1370 (11th Cir. 1998) (citation omitted)

An officer asserting qualified immunity "must first prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991) (quoting *Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir. 1998). Assuming the officer's requisite showing for his discretionary authority, the burden shifts to the Section 1983 plaintiff to demonstrate the impropriety of qualified immunity.

The court's evaluation must be guided by the two-pronged test required by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194, 201 (2001):

> A court required to rule upon the qualified immunity issue must consider, then, this threshold question:  Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?...[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.  This inquiry...must be undertaken in light of the specific context of the case, not as a broad general proposition.

---

[4] *See Lassiter v. Alabama A & M University, Bd. of Trustees*, 28 F.3d 1146, 1149 (11th Cir. 1994) ("Qualified immunity protects government officials performing discretionary functions from civil trials (and the other burdens of litigation, including discovery) and from liability if their conduct violates no 'clearly established statutory or constitutional rights of which a reasonable person would have known.'") (citations omitted).

*See also Marsh v. Butler County*, 268 F.3d 1014, 1031-33 (11th Cir. 2001) (en banc).

### B.    *Undisputed Analytical Facts*

Though the first Count of the Complaint asserts an "unreasonable force" claim for Plaintiff Janet Ainsworth, Plaintiffs failed to advance the claim through briefs and practically conceded at oral argument that the *de minimis* nature of the force applied and injury sustained might warrant the dismissal requested. Upon independent scrutiny, the court concludes that Deputy Inabinett is entitled to qualified immunity on the sole facts alleged – that the deputy "roughly shoved [her] aside, slamming her into a wall and badly bruising her arm." (¶ 22 ). Whether or not the facts indicate a need for any force at all against Mrs. Ainsworth, the amount of force used – coupled with the non-specific injuries and damages broadly claimed without reference to any actual physical injury – indisputably place her claim into the *de minimis* category which does not implicate the excessive force restraints of the Fourth Amendment.[5]

Accordingly, the analysis which follows addresses the deputy's qualified immunity only with respect to the second Count, which targets his encounter with N.A. That Deputy Inabinett acted within the scope of his discretionary authority is not disputed. Irrespective of whether or why the Deputy actually arrested N.A, the parties also agree, and there can be no doubt, that a Fourth Amendment "seizure" occurred so that this amendment properly provides the analytical fulcrum for the excessive force claim.[6]    "A Fourth Amendment seizure does not occur whenever there is

---

[5]*See* discussion of *de minimis* theory, *infra*, in the context of the Count II claim asserted for N.A.

[6]The complaint reports that "Inabinett told the family that he was . . . taking [N.A.] to jail to be charged with obstructing a governmental operation and resisting arrest." (¶ 33). During the course
(continued...)

7

a governmentally caused termination of an individual's freedom of movement . . . nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement . . . but only when there is a governmental termination of freedom of movement through *means intentionally applied*." *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989) (emphasis in original).

### C. *Violation of Constitutional Right*

Accepting as true the Complaint's factual allegations and reasonable inferences therefrom – as is required at this Rule 12(b)(6) juncture – the court discerns N.A.'s excessive force claim to be, in essence, that the circumstances confronted by Deputy Inabinett required no force at all, and any reasonable officer similarly situated would have discerned the lack of need for force, because: (a) N.A. no longer threatened harm to himself (¶ 17 ); (b) N.A. never attacked or threatened to attack either the officer already at the scene or Deputy Inabinett (¶¶ 25, 26 ); and (c ) the first-to-arrive officer had already managed, without using force, to bring under control N.A.'s threatened suicide and remained stationed in the room with N.A. to render any law enforcement assistance made necessary by changing circumstances. (¶ 18).

A constitutional standard of "objective reasonableness", outlined in *Graham v. Connor*, 490 U.S. 386, 396 (1989), "governs a free citizen's claim that law enforcement officials used excessive

---

⁶(...continued)
of oral arguments, Plaintiff's counsel highlighted the absence of any further proceedings on the reported arrest and the consequent ambiguity on whether the officer filed any charges against N.A., an ambiguity referenced in ¶ 34 ("Ultimately, however N.A. was transported by ambulance to a hospital, treated for his injuries, and transferred to a mental health facility.").

force in the course of making an arrest, investigatory stop, or other 'seizure' of his person." *Id.,* at 388:

> Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," *Bell v. Wolfish*, 441 U.S. 520, 550 (1979), however, its proper application requires careful attention to the facts and circumstances of each particular case, including *the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.*

(*emphasis added*). Assessing the reasonableness of the force in controversy must be "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

Inabinett argues that application of the *Graham* balancing factors compels the conclusion that he did not use excessive force and, instead, that the force used and resulting injury were *de minimis*. Neither contention withstands scrutiny at this early stage of the litigation when the court is obliged to accredit the facts averred in the complaint.

The three balancing factors specified in *Graham* militate in favor of the minor plaintiff. The first factor – severity of the crime at issue – is least applicable on the facts presented. Though his mother summoned officers for assistance in preventing his threatened suicide, by the time Deputy Inabinett appeared in his room N.A. no longer demonstrated any active pursuit of that mission. His suicidal actions before the officers arrived did not constitute a crime under state or federal law, and N.A. did not commit a crime in the deputy's presence. Notwithstanding this state's legislated interest in suicide prevention, *see* ALA. CODE § 13 A-3-24 (1977), attempted suicide has not been criminalized, and the facts provide no basis for analyzing the officer's force merely under the reasonableness parameters set by this state statute.

Nor is the third *Graham* factor – *whether he is actively resisting arrest or attempting to evade*

9

*arrest by flight* – probative on this complaint. W*hether the suspect poses an immediate threat to the safety of the officers or others* – the second *Graham* factor – is the more appropriate inquiry for analysis of Inabinett's fundamental contention, that his "actions, both in pushing past [N.A.'s mother] to get to N.A. and in subduing N.A. saved N. A's life." [7] Assuming *arguendo* the deputy's insistence that "nothing in the . . . Complaint . . . even suggests [he] had reason to believe that N.A would not try to hurt himself again," the more probative inquiry for the excessive force analysis is whether anything viewed or heard by the deputy when he arrived at the residence gave him reason to believe that N.A.'s speech, demeanor, or actions presented an immediate threat to the safety of N.A. himself or to the safety of Officer Anderson, already positioned in the room, N.A.'s mother, father, or brother, hovering outside the room in direct response to Officer Anderson's command, or to the deputy himself. The alleged facts and reasonable inferences therefrom readily compel a response in the negative.

  N.A. himself no longer exhibited "a distressed state ... foaming in the mouth" (¶ 11) but instead, "was no longer attempting to harm himself . . . did not so attempt thereafter ... and", in response to Officer Anderson's "calming" speech, he "began to release his grip on the headboard of the bed." That he posed no immediate danger either to Officer Anderson or his family is a conclusion similarly supported by the same averments as well as by the reported effort of N.A.'s mother to restrain Inabinett from confronting N.A. at all: ". . . Inabinett entered the residence with a Taser 'stun gun' drawn . . . Janet asked that Inabinett not display the weapon as she feared the sight of it would frighten the still-fragile N.A., causing him additional distress." (¶ 20-21)

---

[7] *Def.'s Mem.Br.* at 7-8.

Irrespective of the Department's reported knowledge of this minor's mental illness ( ¶ 9), no fact lends even a whisp of reasonableness to Deputy Inabinett's aggressive posture upon entering the residence, blatantly disregarding the mother's effort to update him on the child's current state, and failing to assess for himself those changed circumstances before encountering the suicidal minor. No reasonable officer summoned similarly to a residence – by a mother whose alert attributed to the suicidal son no violence against anyone in the household but only the fact of his attempt "to choke himself" – would proceed with a drawn weapon to accost the minor without first securing a situational update from either the mother or the law enforcement officer already engaged with the minor.

The *nature* of the incident which triggered the call for law enforcement is relevant to the analytical equation:  a reasonable law enforcement officer responding to a mother's call for assistance in order to thwart a child's threatened suicide at home would not expect to confront, and be prepared to resist, the same circumstances reasonably envisioned by a call to respond to a crime – whether in progress, completed, or imminent – or to apprehend a fleeing or suspected criminal, or to restrain a belligerent, abusive, violent, or out-of-control motorist. Instead, reason plainly suggests a greater likelihood of success from a more restrained and cautious approach which acknowledges the target's possibly impaired faculties. The likely success of such a strategy by law enforcement in this case is indicated by N.A.'s cooperative response to Officer Anderson, who "paused to assess the situation, assured the family that an ambulance was on the way, asked Janet, her husband Robert, and their other son, R.A., to step out of N.A.'s room so he could talk with the young man." ( ¶ 16 )

In sum, no asserted fact nor reasonable inference therefrom permits this court to embrace

the deputy's theory that his actions were justified to save, and did in fact save, N.A. Indeed, the only reasonable inference from the allegations is that the deputy initiated an absolutely unnecessary seizure of N.A. by force wholly disproportionate to any triggering event or circumstance. Whether or not the evidentiary record yet to be developed will support these allegations, they are now entitled to credence.

Also not to be ignored are additional facts which cast considerable doubt on the reasonableness of the force applied even if its use in the first instance could be rationalized. Notwithstanding the reportedly impassioned plea of N.A.'s mother that the deputy shield his drawn weapon, Inabinett allegedly barged belligerently into the child's room, disregarding the law enforcement officer who had calmed the child – now "paralyzed with fear and anxiety" – and pummeled him with his fists without any provocation, in-kind reaction, or aggression at all from the child. The unreasonableness of the deputy's conduct led to reportedly frantic yelling by Officer Anderson to curtail the deputy's beating attack (¶27 ). The facts averred underscore N.A.'s lack of resistance to the deputy's beating and belie any basis at all for the deputy's transition from the beating to "fir[ing] his Taser weapon at a point- blank range toward N.A.", leaving puncture wounds, pain, and an immobilized N.A. (¶¶ 28 -30).

No reasonable officer objectively could have believed that the circumstances Deputy Inabinett confronted at N.A.'s residence warranted any force at all, and certainly not the degree of force wielded against a passive, non-aggressive, non-verbal minor who had just been cajoled by another officer to abandon active pursuit of the attempt – observed only by family and not by officers – to commit suicide by choking. Clearly, Deputy Inabinett's alleged conduct in this context constituted a violation of N.A.'s constitutional right, secured by the Fourth Amendment's

protections against unreasonable seizures, to be free from gratuitous and excessive force not required for any legitimate law enforcement or other reasonably necessary purpose.

The case law highlighted by Inabinett does not dictate a contrary conclusion. The officer's sanctioned use of a taser gun in *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004) is too factually inapposite to be instructive[8], and neither *Draper* nor any other precedent holds that the use of a taser under all circumstances can not be excessive force.[9] Nor does the factual context here alleged fit the *de minimis* theory advanced in reliance on *Nolin v. Isbell*, 207 F. 3d 1253, 1257 (11th

---

[8]As established on summary judgment submissions, the *Draper* facts reveal a belligerent truck driver who, after being stopped by an officer for a traffic infraction, became increasingly loud, profane, hostile, and obstinate, complaining of mistreatment and refusing after four requests to comply with the officer's request for certain documents. On the fifth request the officer "promptly discharged his taser gun at Draper's chest", felling him, and "threatened to discharge the taser gun again if Draper did not comply." 369 F.3d at 1273. Under those specific circumstances, the Eleventh Circuit held, in pertinent part.

> Reynold's use of the taser gun to effectuate the arrest of Draper was reasonably proportionate to the difficult, tense and uncertain situation that Reynolds faced in this traffic stop, and did not constitute excessive force. From the time Draper met Reynolds at the back of the truck, Draper was hostile, belligerent, and uncooperative. . . . [T]here was a reasonable need for some use of force in this arrest. . . . Although being struck by a taser gun is an unpleasant experience, the amount of force Reynolds used – a single use of the taser gun causing a one-time shocking - was reasonably proportionate to the need for force and did not inflict any serious injury.

*Id.* at 1278.

[9]Indeed, such a holding would be contrary to the Supreme Court's advice that the test of reasonableness in the context of the Fourth Amendment "requires careful attention to the facts and circumstances of each particular case. *Graham*, 490 U.S. at 396. *Accord, Maiorano v. Santiago*, No. 6:05cv107ORL-19KRS, 2005 WL 1200882 at *5 (M.D. Fla. May 19, 2005) (" ... Defendants urge a reading of Draper that is overly broad. The Eleventh Circuit confined its holding to the facts of that case and did not find as a matter of law that the use of a taser without warning in a tense situation is per se reasonable under the Fourth Amendment.").

Cir. 2000); with only the complaint's allegations presented, the court cannot describe as *de minimis* either the force – an officer's unprovoked beating with his fists followed by his targeted firing of a taser gun, without any warning, notice, or retaliatory attack by the victim – nor the injury – sufficient to prompt the officer's announcement "that he was taking N.A. to the hospital.[10]

### D.    "Fair Notice" of clearly established law

Having found that Deputy Inabinett violated N.A.'s Fourth Amendment right to be free from a gratuitous, unprovoked beating with fists followed by a taser gun assault – absent any provocation, resistance, legitimate law enforcement or other reasonably necessary purpose – the court addresses the second prong of the qualified immunity inquiry: was this constitutional right clearly established at the time of the deputy's encounter with N.A.? "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. Whether an officer had "fair notice" that his conduct would be clearly unlawful can be established in several ways:

---

[10]The excessive force claim in *Nolin* arose from materially different facts, developed on summary judgment, about the nature of the officer's force which caused minor bruising "which quickly disappeared without treatment" and for which Nolin sought no medical treatment; pursuant to a lawful arrest, the officer "merely grabbed [Nolin] and shoved him a few feet against a vehicle, pushed [his] knee into [Nolin's] back and [Nolin's] head against the van, searched {Nolin's] groin area in an uncomfortable manner, and placed [Nolin] in handcuffs." *Nolin*, 207 F.3d at 1258, n.4. Upon comparative analysis, the court finds that both the lack of demonstrated need for force in this case, and the amount of force applied, remove it from the category of post-*Graham* cases in which the Eleventh Circuit has applied the *de minimus* principle to reject a Fourth Amendment claim of excessive force. See discussion, *id.*, at 1256-1257; *see also Crosby v. Terry*, 394 F.3d 1328,1335 (11th Cir. 2004).

> First, the words of the pertinent federal statute or federal constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, even in the total absence of case law. This kind of case is one kind of "obvious clarity" case. . . . Second, if the conduct is not so egregious as to violate, for example, the Fourth Amendment on its face, we then turn to case law . . . [for] broad statements of principle . . . not tied to particularized facts [which] can clearly establish law applicable in the future to different sets of detailed facts. . . . Third, if we have no case law with a broad holding . . . that is not tied to particularized facts, we then look to precedent that is tied to the facts.

*Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002) (internal citations omitted); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[T]he salient question . . . is whether the state of the law . . . gave [the officers] fair warning that their alleged treatment of [the plaintiff] was unconstitutional.")

Defendant Inabinett is correct that "the Plaintiffs have not cited . . . any case containing materially similar facts" and plaintiffs' counsel conceded at oral argument that he can not identify such a case. However, the court concurs with Plaintiff that the Fourth Amendment's prohibition on excessive force is sufficiently clear so that no reasonable officer would believe it appropriate to make an unprovoked physical assault – consisting of beating with his fists and then firing a taser gun weapon – on a reportedly suicidal minor who was then not engaged in any criminal activity or other resistance which made reasonably necessary the use of any force at all. The Eleventh Circuit has found obvious clarity in the Fourth Amendment's prohibition against excessive force sufficiently to deny qualified immunity to officers using more than *de minimis* force against offenders or suspects after they have been restrained sufficiently to cease the acts which triggered the need for force at the outset. *See, e.g., Lee v. Ferraro*, 284 F.3d 1188 (11th Cir. 2002); *Slicker v. Jackson*, 215 F.3d 1225, 1232-33 (11th Cir. 2000) (officer's beating attack on handcuffed suspect who neither resisted nor

15

attempted to flee).[11]  Thus, on facts alleging no need for force at all, fair notice surely derives from the same source.

## IV.

## CONCLUSION

---

[11]In denying requested summary judgment based on the officer's qualified immunity, the court in *Lee v. Ferraro* first found his force in arresting a motorist "plainly excessive, wholly unnecessary, and, indeed, grossly disproportionate under *Graham*." Regarding whether the officer had fair warning then of clearly established law that his force was excessive, the court reasoned:

> Because identifying factually similar cases may be difficult in the excessive force context, we have recognized a narrow exception also allowing parties to show "that the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law." *Priester* [*v. City of Riviera Beach*], 208 F.3d [919] at 926 [(11th Cir. 2000)] (internal quotation omitted). Under this test, the law is clearly established, and qualified immunity can be overcome, only if the standards set forth in *Graham* and our own case law "inevitably lead every reasonable officer in [the defendant's] position to conclude the force was unlawful." *Id*. (*quoting Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993)].
>
> Simply put, the grossly disproportionate force used in this case was clearly established as a constitutional violation because no reasonable officer could have believed that Ferraro's actions were legal. . . . Once an arrestee has been fully secured, such force is wholly unnecessary to any legitimate law enforcement purpose.
>
> As in *Slicker*, *Priester,* and *Smith [v. Mattox*, 127 F.3d 1416 (11th Cir. 1997)], the peculiar facts of this case are "so far beyond the hazy border between excessive and acceptable force that [the officer] had to know he was violating the Constitution even without caselaw on point." *Smith,* 127 F.3d at 1419.

*Lee v. Ferraro*, 284 F. 3d at 1199.

Pursuant to the foregoing facts and reasoning, it is **ORDERED** that:

1. *Defendants' Motion to Dismiss*, filed pursuant to Rule 12(b)(6) based on qualified immunity (Doc. 22, Dec. 13, 2005), is GRANTED on the 42 U.S.C. § 1983 claim asserted by Plaintiff Janet Ainsworth (Count I). Accordingly, JUDGMENT is hereby entered in favor of the sole defendant, Deputy Chris Inabinett, in his individual capacity, and against Plaintiff Janet Ainsworth on all claims asserted by her individually, and such claims are dismissed with prejudice.

2. *Defendants' Motion to Dismiss*, filed pursuant to Rule 12(b)(6) based on qualified immunity (Doc. 22, Dec. 13, 2005), is DENIED on the 42 U.S.C. § 1983 claim asserted by N.A., a minor who sues by and through Janet Ainsworth, his mother and next friend. (Count II). This action shall proceed solely on the Count II claim for this single plaintiff against the sole remaining defendant.

Done this 7th day of February, 2006.

/s/ **Delores R. Boyd**
DELORES R. BOYD
UNITED STATES MAGISTRATE JUDGE