**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| **N.A.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No.:  2:05-cv-740-DRB** |
| ) | |
| **DEPUTY CHRIS INABINETT,** ) | |
| ) | |
| **Defendant.** ) | |

**DEFENDANT'S MEMORANDUM BRIEF IN SUPPORT OF HIS**
**MOTION FOR SUMMARY JUDGMENT**

COMES NOW the Defendant, Covington County Deputy Sheriff Chris Inabinett, and files this Memorandum Brief in Support of his contemporaneously filed Motion for Summary Judgment.

**INTRODUCTION**

Following the Court's February 7, 2006 Memorandum Opinion and Order, with one exception, all of the Plaintiff's claims against Deputy Chris Inabinett were dismissed.  (Doc. 30 at p. 17.)   The sole remaining claim is an individual capacity 42 U.S.C. § 1983 Fourth Amendment excessive force claim.  Id.  Deputy Inabinett now asks the Court to enter an order granting judgment in his favor because there are no genuine issues of material fact and Deputy Inabinett is entitled to judgment in his favor as a matter of law.

**STATEMENT OF FACTS**

The Plaintiff's excessive force claim is based upon an incident that occurred at his home on July 13, 2005.  (Doc. 26 at ¶ 10.)  The facts relevant to the instant motion will be covered below in four categories.  First, Deputy Inabinett will provide the Court with an overview of the

Plaintiff's significant mental health and criminal history. Second, this brief will discuss the events that took place on July 13, 2005, at the Plaintiff's home. Third, Deputy Inabinett will set forth the evidence in the record demonstrating the medical and mental health treatment received by the Plaintiff immediately following the incident underlying the Second Amended Complaint. Finally, this brief will discuss the Plaintiff's criminal troubles following the July 13, 2005 incident.

## I.    THE PLAINTIFF'S MENTAL HEALTH HISTORY AND CRIMINAL RECORD.

At the time of the incident underlying the Plaintiff's Second Amended Complaint, the Plaintiff was a sixteen-year old young man with a diagnosed history of mental illness and instability. Id. at ¶ 8. The Plaintiff's previously diagnosed disorders included Bipolar II Disorder (with possible psychotic features), Conduct Disorder, Oppositional Defiant Disorder, and antisocial personality traits. (Exhibit A, Laurel Oaks Behavioral Health Center Records for Christopher Neal Ainsworth, dated 2/9/05 "2/9/05 Laurel Oaks recs.", p. 3.)[1] The Plaintiff's mother also reported a past history of schizophrenia. (Exhibit B, Excerpts of Deposition of Janet Ainsworth, "J. Ainsworth dep." at 27:6-12.) Prior to July 13, 2005, the Plaintiff had been prescribed a number of medications for the aforementioned conditions including Zoloft, Risperdal, Depakote, Ritalin, Trazodone, Cogentin, and Vistaril. (Exhibit C, Laurel Oaks Behavioral Health Center Records for Christopher Neal Ainsworth, dated 7/13/05 "7/13/05 Laurel Oaks recs.", p. 3; 2/9/05 Laurel Oaks recs. at pp. 3, 5; J. Ainsworth dep. at 24:17-20.) The Plaintiff also had a history of being admitted to Laurel Oaks Behavioral Health Center as many as five times between 2000 and July 13, 2005. (J. Ainsworth dep. at 36:7-9.)

---

[1] For identification purposes, the Plaintiff's Laurel Oaks records will be identified by the "Admit Date" found in the upper right-hand corner of page one of each record.

Behavioral manifestations of the Plaintiff's mental health issues included suicide attempts and hallucinations.  (2/9/05 Laurel Oaks recs. at p. 1; 7/13/05 Laurel Oaks recs. at p. 1; J. Ainsworth dep. at 27:15-36:18.)  The Plaintiff's previous suicide attempts included an attempt to choke himself with a belt.  (2/9/05 Laurel Oaks recs. at p. 1.)  The Plaintiff's hallucinations included things looking into his window, "little people" tearing up his room, and snakes wrapping him up in a pond near the family's home.  (J. Ainsworth dep. at 27:19-28:11.)  The Plaintiff kept knives in his room because of his hallucinations.  (Exhibit D, Excerpts of Deposition of Neal Ainsworth, "N. Ainsworth dep." at 67:7-12.)  The Plaintiff also had a history of picking at wounds on his body, making it difficult for him to heal.  (J. Ainsworth dep. at 14:12-19; Exhibit E, Excerpts of Deposition of Robert Ainsworth, Sr. "B. Ainsworth dep." at 64:18-65:3.)

The Plaintiff also had a history of "severe behavioral problems with being defiant, lying, and being disrespectful."  (7/13/05 Laurel Oaks recs. at p. 1.)  The Plaintiff had mood swings, picked at himself, and attacked his mother when she asked him to get out of bed.  Id.  Dr. Jerlyn McCleod at Laurel Oaks also noted:

> [The Plaintiff] has a history of homicidal ideation of threatening to kill family members when he gets angry with his family.  He once threatened to shoot his mother and reported knowing that there was a gun in the house.  That incident occurred in February, which resulted in the family contacting the police and getting him sent to the Diversion Center.  At that time, he was charged with third degree assault and is now [7/13/05] on probation.

Id. at p. 2.  Dr. McCleod noted the Plaintiff's disorders on July 15, 2005, to include Bipolar II Disorder with psychotic features, Attention Deficit Hyperactivity Disorder Combined Type, Overanxious disorder, Parent/Child Relational Problems, and Conduct Disorder Adolescent Onset.  Id. at p. 4.

The Plaintiff also had a significant history of violence towards others. In addition to threatening his mother, the Plaintiff terrorized his family and hit his older brother, Hunter, in the head. (Exhibit F, Alabama Uniform Incident/Offense Report, Case No. 051100208, "11/07/05 Offense rep.") On November 7, 2005, Covington County deputies were dispatched to the Ainsworth home on a report that the family was not able to leave the home. Id. at 2. Mr. Ainsworth reported that the Plaintiff hit Hunter in the head with a PVC pipe filled with dirt. Id. Hunter required 10 staples in his head to close the wound. Id. Mr. Ainsworth stated that the Plaintiff was out of control and they did not know what to do with him. Id.

As indicated by the Plaintiff in his Second Amended Complaint, his mental health history was well known to local law enforcement. (Doc. 26. at ¶ 9.) According to the Plaintiff's mother, deputies from the Covington County Sheriff's Department had been dispatched as many as four times prior to July 13, 2005, to assist the family. (Doc. 26 at ¶ 9; J. Ainsworth dep. at 37:14-18.) Mrs. Ainsworth also testified that Deputy Inabinett responded on one occasion when the Plaintiff had wandered off and she could not find him. (J. Ainsworth dep. at 38:10-13.) However, the Plaintiff never behaved as irrationally or violently on those previous occasions as he did during the incident underlying the Plaintiff's lawsuit. Id. at 40:12-16.

In January 2005, the Plaintiff became angry with his mother and threatened to kill her. (2/09/05 Laurel Oaks recs. at p. 1.) He indicated that he was aware of a gun in the house. Id. The Plaintiff threatened to shoot his mother with the gun. (7/13/05 Laurel Oaks recs. at p. 2.) The family called law enforcement and the Plaintiff was charged with Third Degree Assault Violence. (2/09/05 Laurel Oaks recs. at p. 1.) The Plaintiff received probation for the charge and was still under probation at the time of the incident underlying this lawsuit. (7/13/05 Laurel Oaks recs. at p. 2.)

## II.    THE JULY 13, 2005 INCIDENT.

On July 13, 2005, the Plaintiff and his mother had an argument over the Plaintiff's failure to take his medication.  The Plaintiff recalls that it was because he was not taking his medication. (N. Ainsworth dep. at 28:1-8.)[2]  Mrs. Ainsworth told the Plaintiff that she was going to call some treatment centers and get him admitted.  (J. Ainsworth dep. at 49:9-50:20; N. Ainsworth dep. at 27:11-16.)  Mrs. Ainsworth called a facility in Luverne, Alabama, but was informed that it did not take children.  (J. Ainsworth dep. at 50:7-12.)[3]

The Plaintiff overheard Mrs. Ainsworth's conversation with the Luverne facility and became angry.  (J. Ainsworth dep. at 49:9-15, 50:16-20; N. Ainsworth dep. at 29:13-15.)  The Plaintiff went in to his bedroom and shut the door.  (J. Ainsworth dep. at 52:13-19; N. Ainsworth dep. at 32:16-17.)  The Plaintiff's bedroom was immediately adjacent to the living room where Mrs. Ainsworth was calling the facility in Luverne.  (J. Ainsworth dep. at 50:21-52-9, Ex. 3.)

Once the Plaintiff was in his room, he retrieved a leather belt, put it around his neck, and ran the loose end through the buckle.  (N. Ainsworth dep. at 34:8-15.)  He then used both hands to pull the loose end of the belt to close the loop around his neck, and began choking himself. (Exhibit G, Excerpts of Deposition of Robert Ainsworth, Jr. "R. Ainsworth dep." at 15:22-16:3; B. Ainsworth dep. at 23:20-22.)  The Plaintiff was sitting on his bed with his back against the wall near the foot of the bed while he choked himself.  (N. Ainsworth dep. at 39:11-40:1.)  The Plaintiff believes that he choked himself in this manner for ten to fifteen seconds.  Id. at 34:19-35:1.)

---

[2] In her deposition testimony, Janet Ainsworth was not clear if the Plaintiff's failure to take his medication was due to his refusal to do so or if they were out of the medication.  (J. Ainsworth dep. at 23:3-17.)  The Plaintiff, however, is clear in his recollection that it was because he stopped taking his medication.  (N. Ainsworth dep. at 28:22-29:9.)
[3] The Plaintiff thought she was calling Laurel Oaks.  (N. Ainsworth dep. at p. 29:13-15.)

The Plaintiff's younger brother, Robert, was in his own room at the time his mother and brother were arguing. (R. Ainsworth dep. at 13:10-14:5.) Near the end of the argument, Robert went into the living room to see why the two were arguing. Id. at 14:18-15:1. Mrs. Ainsworth was dialing the phone and told Robert to go check on his brother. Id. at 15:2-10. Robert opened the door to the Plaintiff's room and saw his brother sitting on the bed as described above. Id. at 15:11-16:9. Robert told his mother what the Plaintiff was doing and went into the Plaintiff's room to try to remove the belt. Id. at 15:10-13. Robert struggled alone with his brother for one or two minutes in a vain attempt to get the belt from around his neck. Id. at 18:13-16.

Mr. Ainsworth testified that he heard Robert tell his mother that the Plaintiff had a belt around his neck. (B. Ainsworth dep. at 21:12-18.) Mrs. Ainsworth verbally tried to get the Plaintiff to loosen the belt but he refused. (J. Ainsworth dep. at 55:6-9.) Mr. Ainsworth entered the Plaintiff's room and assisted Robert in his efforts to take the belt off of the Plaintiff's neck. Robert had the fingers of one hand between the belt and his brother's neck. (B. Ainsworth dep. at 23:12-24:4.) Mr. Ainsworth grabbed the Plaintiff's hands and moved them to where Robert was able to get his second hand between the belt and the Plaintiff's neck. From there, the two were able to completely take the belt off of the Plaintiff's neck. (R. Ainsworth dep. at 19:4-20-6; B. Ainsworth dep. at 24:11-21.) It took approximately two minutes for Mr. Ainsworth and Robert to remove the belt. (R. Ainsworth dep. at 24:22-25:3.) The belt was left on the bed. (J. Ainsworth dep. at Exs. 1-3.)

Once the belt was off his neck, the Plaintiff began fighting and cursing. (R. Ainsworth dep. at 20:16-20.) Working together, Mr. Ainsworth and Robert got the Plaintiff to lie down on the bed with his head near the headboard and his feet near the foot of the bed. Robert was at the Plaintiff's head holding the Plaintiff's arms down. Mr. Ainsworth was at the foot of the bed

holding the Plaintiff's feet.  (R. Ainsworth dep. at 20:21-23:10; B. Ainsworth dep. at 25:11-26:2.)  Some time after the struggle to remove the belt, the Plaintiff either began foaming at the mouth or vomited.  (J. Ainsworth dep. at 56:3-9.)

In the meantime, Mrs. Ainsworth called Covington County 911.  (Doc. 26 at ¶ 12; J. Ainsworth dep. at 55:10-13.)  Mrs. Ainsworth informed the operator that her son had tried to hang himself and requested a rescue squad.  (Exhibit H, Declaration of Kristi Stamnes, "Stamnes dec." at Ex. A; Exhibit I, Transcript of 911 call, "911 transcript" at p. 1.)[4]  A Covington County E911 dispatcher remained on the line with Mrs. Ainsworth until the first officer arrived on the scene.  Id.  In response to Mrs. Ainsworth's call, the E911 operator dispatched an Andalusia Rescue Unit, Deputy Inabinett, Red Level, Alabama Chief of Police David Anderson, and several other law enforcement units within Covington County to the Plaintiff's home.  (Exhibit J, Affidavit of Chris Inabinett, "Inabinett aff." at Exs. B and C; Exhibit K, Affidavit of David Anderson, "Anderson aff." at ¶ 3.)[5]

The telephone call was recorded, and the recording does nothing to support the allegations in the Second Amended Complaint that Mrs. Ainsworth "relieved [the Plaintiff's] immediate distress."  (Doc. 26 at ¶ 12.)  Deputy Inabinett urges the Court to listen to the audio recording of the call and review the attached transcript.  Of particular relevance to the Plaintiff's claim in this case, the following was recorded by the E911 system:

Janet Ainsworth:        Don't let him hurt himself.

---

[4] Exhibit I is a transcript of Stamnes dec., Exhibit A, which is a recording of the 911 call placed by Janet Ainsworth on July 13, 2005.  For purposes of brevity, when citing to the 911 recording, the citation form to be used in this brief will be to the transcript.
[5] Exhibit B to Deputy Inabinett's affidavit is a recording of the Covington County public safety radio traffic made during the course of the event underlying the Plaintiff's Second Amended Complaint.  (Inabinett aff. at ¶ 8).  Exhibit C to Deputy Inabinett's affidavit is a transcript of the radio traffic made using Deputy Inabinett's personal knowledge and review of the radio traffic recording.  Id. at ¶ 9.  Chief Anderson also verifies the accuracy of the transcript.  (Anderson aff. at ¶ 4.)  As with the transcript of the 911 call, citations will be to the transcript of the 911 call, identified hereafter as "Radio traffic".

. . .

Neal Ainsworth:      Y'all better let me go.  I'm going to hit y'all.

Janet Ainsworth:     No you're not.  Just lay down.  Lie down.  Keep him down.

. . .

Robert Ainsworth Sr.:He's hurting me.

Janet Ainsworth:     Don't hurt your Daddy Neal.

Robert Ainsworth Jr.: I got him.  Daddy, let go of him.

Janet Ainsworth:     Daddy.  Neal, don't hurt Daddy.

. . .

Janet Ainsworth:     You can't do this.  You can't keep trying to hurt yourself.

Neal Ainsworth:      I ain't going.

Robert Ainsworth Sr.: Yes you are.

Neal Ainsworth:      ***When they come, I'm going to hit them and hit everybody else, you got to hold (inaudible).  I ain't going back to jail***.

Janet Ainsworth:     They'll hold you down.

Robert Ainsworth Sr.: You do, you're going to jail, Neal.

Neal Ainsworth:      I don't care.  (inaudible)

Janet Ainsworth:     No, you're not.

Robert Ainsworth Sr.: You dang sure will.

Janet Ainsworth:     You're gonna have to be still.

Robert Ainsworth Sr: It ain't gonna be me and your momma.

Neal Ainsworth:      ***Yeah, but I'm gonna punch 'em in the face.  I'm telling you***.

Janet Ainsworth:     You can't hurt yourself Neal.  It's over with.

Neal Ainsworth:      It's over with (inaudible).

| | |
|---|---|
| Janet Ainsworth: | No more hurting yourself. |

. . .

| | |
|---|---|
| 911 Operator: | OK Honey, tell me what's going on. |
| Janet Ainsworth: | He's just laying here fighting us, and just |

. . .

| | |
|---|---|
| Neal Ainsworth: | ***They can't take me out of here.  They better have some guns, stun guns, They better have a bulldozer***. |

. . .

| | |
|---|---|
| Neal Ainsworth: | ***I'll show all of them mother fuckers.  I'm gonna show them.  I'm gonna show them, too***. |
| Janet Ainsworth: | Neal, listen. |
| Neal Ainworth: | ***Tell them mother fuckers when they come*** . . . |
| Janet Ainsworth: | Neal, hush your mouth. |
| Neal Ainsworth: | . . . ***that I'll stab them mother fuckers' ass*** (inaudible). |
| Janet Ainsworth: | No you can't. |
| Neal Ainsworth: | Yes, I'll show 'em. |
| 911 Operator: | What's his name. |
| Janet Ainsworth: | His name is Christopher Neal Ainsworth. |
| Neal Ainsworth: | Damn right my name's Christopher.  Look at my record and I'll show them mother fuckers something up there (inaudible).  ***They ain't gonna grab me.  I'm telling y'all I'll punch them in the fucking face, now.***  Y'all gonna let me go because you wouldn't be calling God damn Luverne, I wouldn't be doing this shit. |
| Janet Ainsworth: | You've got to have a place to go to stop it. |
| Neal Ainsworth: | I ain't going to no place. |

| | |
|---|---|
| Janet Ainsworth: | You've got to be stopped. |
| Neal Ainsworth: | No, I've been up to (inaudible) twice on the account of y'all . . . |
| Janet Ainsworth: | But you can't . . . you can't . . . |
| Neal Ainsworth: | . . . because y'all callin the cops and that kinda of crap. |

. . .

| | |
|---|---|
| Neal Ainsworth: | I won't say nothing until they get here and I'm fuckin' use all my strength. |

. . .

| | |
|---|---|
| Neal Ainsworth. | ***They ain't gonna calm me if they ain't got a bullwhip***. |

. . .

| | |
|---|---|
| 911 Operator: | OK.  What made him do this?  What set him off, honey? |
| Janet Ainsworth: | He'll do that sometimes.  He just goes off the handle.  It's hard to explain.  We've had him at psychiatrists, and you know just all different doctors, and nobody can seem to find out what's been going on with him. |
| 911 Operator: | OK. |
| Janet Ainsworth: | ***And he's just bad about when he gets mad, he wants to hurt . . . he wants to hurt everybody around him, and he wants to hurt himself***.  And this time, he come in here and stuck this belt around his neck like . . . he laid down on the bed and stuck it around his neck and put the thing in the hole you know, and we like to have never got it off. |

. . .

| | |
|---|---|
| 911 Operator: | He seems to have calmed down, Janet. |
| Janet Ainsworth: | ***Yeah, he will but then he'll get mad when they get here because he won't go . . . he won't want to go***. |

. . .

| | |
|---|---|
| Janet Ainsworth: | Come on.  ***He's very strong.  I'm begging you.  You're hurting him now.   You're hurting your daddy, Neal.   Neal, you're hurting your daddy, let go now***. |

. . .

| | |
|---|---|
| Neal Ainsworth: | ***I'm gonna hit you.  I'm gonna hit them too***. |

. . .

| | |
|---|---|
| Janet Ainsworth: | Stop Neal. |
| Neal Ainsworth: | (inaudible) |
| Janet Ainsworth: | No, I'm gonna . . . you're going to stay still. |
| Neal Ainsworth: | ***I'll get ya***. |
| Janet Ainsworth: | Nuh uh, Neal. |
| Neal Ainsworth: | ***I'll show you what I'm gonna do***. |
| Janet Ainsworth: | Neal.  They are right here now. |
| Robert Ainsworth Jr: | You can't do that. |
| 911 Operator: | They're coming to you. |
| Janet Ainsworth: | Neal. Neal. |
| Robert Ainsworth Jr.: | Come on Neal. |
| Janet Ainsworth: | Stop Neal.  Neal, stop. |
| Robert Ainsworth Sr: | Neal . . . |
| Janet Ainsworth: | Stop! |
| Robert Ainsworth Jr: | Come on, Neal. |
| Janet Ainsworth: | You gotta . . .Neal stop. |
| Robert Ainsworth Sr.: | Stop it now. |
| Janet Ainsworth: | Stop Neal.  Stop Neal. |
| Robert Ainsworth Sr: | ***Neal.  Nuh uh, don't break that***. |
| Janet Ainsworth: | Nuh uh. |
| 911 Operator: | What's he doing, honey? |

11

Robert Ainsworth Sr:  Neal!

Janet Ainsworth:       He's fightin'.

Robert Ainsworth Sr.  Neal!

Janet Ainsworth:       Oh God.

Robert Ainsworth Sr:  Oh!

***Phone beeps twice.***

911 Operator:          OK.

Janet Ainsworth:       Stop it.  They're right here.  They out here.

Robert Ainsworth Sr:  Quit.  Quit!

Neal Ainsworth:        Y'all, stop!

. . .

Janet Ainsworth:       Need help?  Hold him down.

911 Operator:          ***OK, he's coming to you.  He's at your yard.  Can he get in?  Can the officer come in?***

Janet Ainsworth:       ***Yes, please hurry***.

911 Operator:          David Anderson is in the front yard now.

Janet Ainsworth:       Yes, I see him.  OK, he's here.

(911 Transcript at pp. 2-13, emphasis added.)  The Plaintiff's struggle with his family lasted at least eleven minutes and 27 seconds as evidenced by the 911 tape.  (Stamnes dec. at Ex. A.)

While the Plaintiff struggled with his family and the 911 operator listened, information was relayed on the Covington County public safety frequency by the 911 operators (referred to as "Command") to the responding units.  (See generally Radio traffic.)  The relevant information provided to Deputy Inabinett and others, as reflected in the radio traffic, is set forth below:

| | |
|---|---|
| Female Command: | 2316 [Deputy Chris Inabinett]. |
| 2316 [Dep. Inabinett]: | Go ahead. |
| Female Command: | Need you to respond to 5825 Sweatt Lane, 5825 Sweatt Lane. Signal 25 [attempted suicide]. Signal 25 by hanging. Subject is down at this time and rescue responding. |

. . .

| | |
|---|---|
| Female Command: | 2316. The subject is threatening violence toward officers. |

. . .

| | |
|---|---|
| Male Command: | Hope you got your TASER. |

. . .

| | |
|---|---|
| Male Command: | They's still fighting with him. |

. . .

| | |
|---|---|
| Male Command: | Units responding, be advised, the subject's fighting with them again now. |

(Radio traffic at pp. 2-5.) Deputy Inabinett was clearly concerned about the danger involved in the situation. He asked whether the Covington County Incident Response Team (IRT) was needed and if the Plaintiff had attempted suicide with a weapon. Id. at pp. 3-4. Covington County Chief Deputy Walter Inabinett advised all units to make sure their video recorders were turned on. Id. at p. 5.

At 2:56 p.m., Chief Anderson was the first emergency unit to reach the Plaintiff's home. (Radio Traffic at p. 6; Anderson aff. at ¶ 5.) Prior to July 13, 2005, Chief Anderson was familiar with the Ainsworth family and was aware of other incidents involving the Plaintiff – including an arrest. (Anderson aff. at ¶ 6.) He knew that the Plaintiff was troubled and had a propensity to become suddenly violent. Id. at ¶ 7.

Chief Anderson initially met Mrs. Ainsworth and asked her what was going on. She responded that the Plaintiff and her husband Bobby were fighting in the Plaintiff's bedroom. She said she did not know what was wrong with the Plaintiff, but that he had become violent and tried to hang himself with a belt. (Anderson aff. at ¶ 9.)

Chief Anderson went to the Plaintiff's bedroom. He saw that Robert and Bobby Ainsworth were struggling with the Plaintiff on a bed. Chief Anderson asked Robert and Bobby to leave the room, and they did so. (Anderson aff. at ¶ 10.) When he was released, the Plaintiff moved to the head of the bed and wrapped his arms around the bed's metal headboard. (R. Ainsworth dep. at 26:22-27:3.)

Chief Anderson was alone in the Plaintiff's room with him for approximately one to two minutes. (Anderson aff. at ¶ 14.) During this time, Chief Anderson spoke to the Plaintiff and attempted to get him to calm down. The Plaintiff relaxed some but remained agitated. He also maintained a strong grip on the headboard of his bed. Id. at ¶ 13.

Deputy Inabinett arrived at the Plaintiff's trailer one minute after Chief Anderson arrived. (Radio Traffic at p. 6; see also Inabinett aff. at Exs. D and E.)[6] Deputy Inabinett's immediate concern, in light of the Plaintiff's threat to harm officers, was Chief Anderson's safety. (Inabinett aff. at ¶ 28.) He called out for Chief Anderson but did not receive a response. Deputy Inabinett then ran to the back of the trailer, and seeing no one, came back to the front. Id. at ¶ 31.

---

[6] Exhibit D to Deputy Inabinett's affidavit is a copy of the video taken from Deputy Inabinett's dashboard video system during the incident underlying the Plaintiff's Second Amended Complaint. The system includes a remote body microphone that Deputy Inabinett was wearing that enabled the video system to record audio anywhere Deputy Inabinett went. (Inabinett aff. at ¶ 24; Anderson aff. at ¶ 15.) As with the other audio recordings, a transcript is provided (Exhibit E to Deputy Inabinett's affidavit) that is based upon the personal knowledge of both Deputy Inabinett and Chief Anderson and will be cited to by Deputy Inabinett in this brief. (Inabinett aff. at ¶ 25; Anderson aff. at ¶ 15.) The transcript of the video will be referenced as "Video".

Deputy Inabinett went up to and entered the front door of the trailer. In his right hand, he held his M-26 Advanced TASER. (Inabinett aff. at ¶ 32.) Deputy Inabinett held the TASER in his hand because he did not have a holster on his duty belt for it. He wanted it with him because of the information that had been given to him by the E911 operators. Deputy Inabinett's M-26 TASER was as large as a full-sized Glock automatic handgun and its frame was made of a black polymer. To prevent the device from being misidentified as a handgun, it had yellow markings on it. Id. at ¶¶ 29-30.

Mrs. Ainsworth was in the front doorway and told Deputy Inabinett that everything was okay. Deputy Inabinett asked Mrs. Ainsworth to move and to tell him Chief Anderson's location. (Inabinett aff. at ¶ 32; Video at p. 1.) Mrs. Ainsworth responded again that it was okay, and did not answer Deputy Inabinett's question regarding Chief Anderson's location. Mr. Ainsworth, however, stated that Chief Anderson was in the Plaintiff's room and pointed to it. (Inabinett aff. at ¶ 33; Video at p. 1.) The Plaintiff's room was immediately adjacent to the living room where Deputy Inabinett, Mrs. Ainsworth, and Mr. Ainsworth initially encountered each other. (Inabinett aff. at ¶ 34; J. Ainsworth dep. at Exs. 3, 6.)

Deputy Inabinett went to the bedroom indicated by Mr. Ainsworth. As he approached, he was able to see Chief Anderson and the Plaintiff. (Inabinett aff. at ¶¶ 34-35.) The Plaintiff was sitting on a bed in the far corner of the room. Id. at ¶ 35. The Plaintiff was still holding on to the metal railing of the bed's headboard. Id.

Deputy Inabinett entered the room and stopped next to Chief Anderson on the Chief's right side. (Inabinett aff. at ¶ 36). Deputy Inabinett asked the Plaintiff, "What's up, man?" Id.; see also Video at p. 1.[7] Deputy Inabinett observed that the Plaintiff appeared to be foaming at

---

[7] The Plaintiff has alleged, and his family has testified, that Deputy Inabinett ran straight into the room, jumped up on the bed, and began beating the Plaintiff without stopping. (Doc. 26 at ¶¶ 23-24; B. Ainsworth dep. at 41:7-13.)

the mouth and had a wild look on his face.  (Inabinett aff. at ¶ 40.)    The Plaintiff stated

repeatedly that he was not going anywhere to each of at least twelve different

commands/requests from Chief Anderson and Deputy Inabinett for the Plaintiff to come with

them.  (Video at pp. 1-2.)[8]  After Chief Anderson and Deputy Inabinett's first entreaties recorded

on the video tape, the Plaintiff responded:

> No.  I'm not goin' no goddamn where, man.  Y'all are gonna have to choke me
> down, cause I fuckin' ain't goin' no goddamn-where.

(Video at p. 1.)

After the first verbal instructions were refused, Deputy Inabinett warned the Plaintiff for

the first time that he would use the TASER.  (Inabinett aff. at ¶ 41; Video at pp. 1-2.)  Deputy

Inabinett did so because the Plaintiff's violent and irrational behavior led him to believe that the

Plaintiff posed a significant danger to himself as well as the law enforcement officers present in

the room.  (Inabinett aff. at ¶ 41.)  The Plaintiff's response was that Deputy Inabinett would not

shoot him with the TASER.  (Inabinett aff. at ¶ 41; Video at p. 2.)  The three members of the

Plaintiff's family present in the trailer, Janet, Bobby, and Robert Ainsworth, were behind Deputy

Inabinett in the living room.  (Inabinett aff. at ¶ 45.)   Hearing Deputy Inabinett's warning

regarding the TASER, Mrs. Ainsworth became upset and Deputy Inabinett heard her say "please

don't", which he interpreted to be a request for him not to use the TASER.  (Inabinett aff. at ¶

43; Video at p. 2.)

---

The undisputable evidence of the dashboard video completely eviscerates this allegation.  The audio portion of the video tape clearly demonstrates that Deputy Inabinett stopped and spoke to the Plaintiff.  A minimum of 28 seconds elapsed from the time that Deputy Inabinett says "What's up, man?" until the time that the sounds of the scuffle begin.  (Inabinett aff. at Ex. D.)  Under Eleventh Circuit precedent, inherently unreliable eyewitness testimony that contradicts physical evidence may be disregarded, even on summary judgment.  <u>Kesinger v. Herrington</u>, 381 F.3d 1243, 1249 (11th Cir. 2004) (disregarding unreliable eyewitness testimony about police shooting and granting qualified immunity for officer).
[8] At one point, Chief Anderson referred to the Plaintiff by a shortened form of his first name, "Chris".  This comment was directed at the Plaintiff and not Deputy Inabinett.  (Anderson aff. at ¶ 16.)

Mrs. Ainsworth's outburst increased Deputy Inabinett's concerns about the situation as his training and experience had taught him that family members in domestic violence situations could turn on officers summoned to help them. (Inabinett aff. at ¶ 44.) Domestic violence situations, in Deputy Inabinett's experience, could escalate quickly and explode into violent confrontations with no warning. Id. Deputy Inabinett was also worried that he had a violent and unstable subject in front of him and three members of the subject's family behind him cutting off any line of retreat. Id. at ¶ 45. Deputy Inabinett also knew that the rescue squad could not, and would not, render any treatment to the Plaintiff until he and Chief Anderson were able to make the area safe for the ambulance crew to enter. Id. at ¶ 46.

Therefore, Deputy Inabinett decided to try to end the confrontation as quickly as he could and get the Plaintiff out of the trailer. (Inabinett aff. at ¶ 46.) He told the Plaintiff twice more to get out of the bed and warned for the second time that he would use the TASER. (Inabinett aff. at ¶ 48; Video at p. 2.) Mrs. Ainsworth continued to become increasingly emotional despite Chief Anderson's assurances to her that the TASER would not hurt her son. (Inabinett aff. at ¶ 49; Video at p. 2.)

Deputy Inabinett could see that the Plaintiff weighed as much or more than he did. (Inabinett aff. at ¶ 48.) However, he could also see that the Plaintiff was "a young man." Id. He asked the Plaintiff how old he was, but the Plaintiff did not answer. Id.

Deputy Inabinett decided to try again to get the Plaintiff to comply without using the TASER. (Inabinett aff. at ¶ 51.) He issued at least four additional commands for the Plaintiff to "come on" and the Plaintiff refused. Id. at ¶ 53; Video at p. 2. Mrs. Ainsworth begged her son not to make Deputy Inabinett use the TASER. (Video at p. 2.) Chief Anderson issued three further commands to the Plaintiff. (Video at p. 2.) All of these commands/entreaties were

ignored by the Plaintiff, and he repeatedly stated that he was not going anywhere. (Anderson aff. at ¶ 17; Inabinett aff. at ¶ 53; Video at pp. 2-3.)

As Deputy Inabinett issued his final four commands, he put his TASER into a back pocket, and moved to his right towards the foot of the Plaintiff's bed. (Inabinett aff. at ¶ 51.) He wanted to try one more time to talk the Plaintiff off the bed, and if that failed, to get into a position where he and Chief Anderson could try to pry the Plaintiff from the headboard. Id. The Plaintiff focused on Deputy Inabinett as he moved. Id. at ¶ 52. When Deputy Inabinett told the Plaintiff to "come on" for the last time, he was standing at the foot of the Plaintiff's bed. Id. at ¶ 55.

Apparently anticipating Deputy Inabinett's next actions, the Plaintiff stated, "don't come across the bed, 'cause I'll have to hit ya." (Inabinett aff. at ¶ 55; Video at p. 3.) Deputy Inabinett and Chief Anderson then moved simultaneously towards the Plaintiff. Chief Anderson grabbed one of the Plaintiff's arms and pulled while Deputy Inabinett tried the same with the other arm. (Inabinett aff. at ¶ 56.) They tried to pull the Plaintiff's hands off the headboard for several seconds but they were unsuccessful as the Plaintiff was very strong. Id. at ¶ 57.

Deputy Inabinett then decided to try a nerve-strike technique he learned in the police academy. There is a nerve center on the forearm below the elbow that if struck properly, can cause numbness in the arm. Deputy Inabinett struck the Plaintiff once in this nerve center on the left arm and the Plaintiff let go of the headboard with his left arm. Deputy Inabinett then struck the Plaintiff's right forearm, but the Plaintiff maintained his grip. (Inabinett aff. at ¶ 58.) The Plaintiff then began kicking at Deputy Inabinett and the two officers backed off the bed. (Anderson aff. at ¶ 21.) The entire effort lasted a mere six seconds. (Inabinett aff. at Ex. D.)[9]

---

[9] This time is the period between Plaintiff's threat to hit Deputy Inabinett if he comes across the bed and Chief Anderson statement to Deputy Inabinett to "Get him. Light him up." (Inabinett aff. at Ex. D.)

Chief Anderson told Deputy Inabinett to "get him, light him up", meaning to use the TASER on the Plaintiff.  (Inabinett aff. at ¶ 61; Anderson aff. at ¶ 22; Video at p. 3.)  Deputy Inabinett pulled his TASER out, turned it on, aimed it at the Plaintiff, and fired the device by pulling the trigger.  (Inabinett aff. at ¶¶ 62, 66.)  The Plaintiff was struck by two probes from the TASER – one in his upper left arm and one in his left side.  (N. Ainsworth dep. at Ex. 4.)   The Plaintiff received a single five-second charge of electricity from the TASER.  (Inabinett aff. at ¶ 66, Ex. D.)[10]

With a cartridge in it, the M-26 TASER fires two probes that are similar to straightened number two fishhooks.  The probes enter the subject's skin or clothing and conduct .0036 amps of electricity into the subject's body.  The electricity originates in the TASER and travels down two wires that are connected to the two probes.  The TASER will deliver a five-second charge of electricity when the trigger is pulled regardless of whether the trigger is held down or released. The discharge can only be stopped during the five seconds by turning the TASER's safety on (thereby turning the device off).  (Inabinett aff. at ¶¶ 64-65.)[11]

When the Plaintiff was subjected to the TASER, he finally released the headboard. (Inabinett aff. at ¶ 67; N. Ainsworth dep. at 66:1-4.)  Deputy Inabinett ordered him to lay on his belly so he could be handcuffed.  (Video at p. 3.)  Deputy Inabinett told Chief Anderson to handcuff the Plaintiff.  Id.  The Plaintiff was warned that if he moved, he would again receive another discharge from the TASER.  Id.  The Plaintiff ceased resisting the officers, and no further force was used against him.  (Inabinett aff. at ¶ 70.)

---

[10] The Plaintiff and his family again testified in their deposition to the existence of something the physical evidence proves did not happen – that Deputy Inabinett fired the TASER twice.  (N. Ainsworth dep. at 65:1-5; B. Ainsworth dep. at 49:15-17.)  The video tape of the incident – the physical evidence – proves otherwise.  The sounds of the TASER discharge can be heard one continuous time for a total of five seconds.  (Inabinett aff. at Ex. D.)  Once the TASER's sounds stop after five seconds, they are not heard again.  Id.  As the physical evidence proves that the TASER was fired only once, the Court should disregard contrary testimony.  Kesinger, 381 F.3d at 1249.
[11] Deputy Inabinett is a certified TASER instructor.  (Inabinett aff. at ¶ 63.)

In the meantime, the Plaintiff's family became irate and emotional. Mrs. Ainsworth can be heard on the video tape crying and yelling that her son was sick and that she had called for an ambulance. (Video at pp. 3-4.) Deputy Inabinett told her to stay and let him do his job. Id. at p. 4. Mr. Ainsworth attempted to charge into the bedroom when Deputy Inabinett fired the TASER and was restrained by his wife and son, Robert. (B. Ainsworth dep. at 49:1-9.) Deputy Inabinett put his hand on his firearm without drawing it and warned Mr. Ainsworth to stay out of the room. Id. at 48:1-18.

Deputy Inabinett then turned his attention to the Plaintiff and began trying to reassure him that he would be fine. Deputy Inabinett told the Plaintiff he could get up and walk. He told the Plaintiff that they had all been TASERed before. He called the Plaintiff "buddy" and said he was going to get him checked out. (Inabinett aff. at ¶ 71; Video at pp. 4-5.) Chief Anderson used his radio to inform the waiting units and Command that a TASER had been deployed and it was safe to bring the ambulance in. (Video at p. 5; Radio Traffic at p. 6.)

Deputy Inabinett and Chief Anderson walked the Plaintiff through the trailer and out to the front of Deputy Inabinett's patrol car. Deputy Inabinett documented where the probes had struck the Plaintiff by positioning him in front of the video camera. At that point, Deputy Inabinett told the Plaintiff he was under arrest for obstruction of governmental operations and resisting arrest. (Inabinett aff. at ¶¶ 70-73, Ex. D; Video at pp. 5-6.) The Plaintiff's mother can be seen and heard on the videotape continuing to behave in an emotional manner. (Inabinett aff. at Ex. D.)

Deputy Inabinett then escorted the Plaintiff back to the ambulance where he received treatment by the paramedics. (Inabinett aff. at ¶ 74.) After receiving a warning from Deputy Inabinett not to fight again or he would be shot with the TASER, the probes were removed from

the Plaintiff's skin by the paramedics. (N. Ainsworth dep. at p. 72:2-7, Ex. 5; Inabinett aff. at ¶ 75.) The Plaintiff was asked about a wound on the center of his forehead and he responded that it was from a four-wheeler accident. (Video at p. 7; see also J. Ainsworth dep. at 13:2-14:7.)

While the Plaintiff was being treated, his mother stepped up her emotional tirade.[12] (Inabinett aff. at ¶ 76; Video at pp. 8-9.) Deputy Inabinett tried to calm Mrs. Ainsworth down, but she persisted in acting improperly in front of her son. Concerned that Mrs. Ainsworth's antics and emotional state would cause the Plaintiff to begin fighting again, Deputy Inabinett took Mrs. Ainsworth back into the house to show the investigators what had happened. (Inabinett aff. at ¶¶ 76-77; Video at pp. 9-10.)

Deputy Inabinett, Mr. Ainsworth, Mrs. Ainsworth, and several of the Covington County investigators went back inside the Plaintiff's trailer. (Inabinett aff. at ¶ 77.) Mrs. Ainsworth showed the investigators the room and described what had happened previously. (Inabinett aff. at ¶ 79; Video at pp. 9-12.) Contrary to the testimony both she and the Plaintiff gave in their depositions, Mrs. Ainsworth told the investigators the Plaintiff had taken his medication that morning. (Video at p. 11.) Mr. Ainsworth also told the investigators that the Plaintiff had been taking his medication. Id. at p. 10.

Deputy Inabinett went to the kitchen of the trailer to wash his hands. Mr. Ainsworth was in the kitchen and the two men began talking. Mr. Ainsworth told Deputy Inabinett that he did what he had to do. Mr. Ainsworth's attitude changed, however, when he shortly thereafter learned that Deputy Inabinett was the son of Walter Inabinett, the Covington County Chief Deputy. Mr. Ainsworth stated that Chief Inabinett had arrested him for no reason. Ironically, the arrest to which Mr. Ainsworth referred involved Mr. Ainsworth striking the Plaintiff with a

---

[12] Mrs. Inabinett also has a diagnosed history of mental illness and takes medication for it. (J. Ainsworth dep. at 24:22-25:8.)

cane.  (Inabinett aff. at ¶¶ 78, 83, Ex. D; Exhibit L, Alabama Uniform Arrest Report, Case No. 040901229.)

## III.    PLAINTIFF'S SUBSEQUENT MEDICAL/PSYCHIATRIC TREATMENT.

The Plaintiff was taken by ambulance to the Andalusia Regional Hospital Emergency Room.  (N. Ainsworth dep. at 80:13-17; Exhibit M, 7/13/05 Andalusia Regional Hospital Records for Christopher Neal Ainsworth, "7/13/05 ER recs." at p. 1.)  The "Chief Complaint" indicates that [patient] had a belt around neck throat suicidal [sic]".  (7/13/05 ER recs. at p. 2.) The Plaintiff arrived at the emergency room at 3:43 p.m. Id. at p. 1.

The Plaintiff was given a physical exam.  Id. at p. 2.[13]  The exam noted that the Plaintiff's appearance was "normal" and that his extremities were not injured.  Id.  A mark on the center of the Plaintiff's forehead, however, was noted.  Id. at p. 3.  Blood and urine tests were conducted. Id. at p. 1, 4-8.  The Plaintiff was also monitored on an EKG machine.  Id. at p. 9.  He recalls being given medication to slow his heart rate.  (N. Ainsworth dep. at 81:19-82:6.).  The staff also put some cream and a band-aid on each of the Plaintiff's TASER wounds.  (N. Ainsworth dep. at 86:17-21.)  The Plaintiff received no treatment for the back of his head, his hands, or his back. Id. at 86:22-87:9.

The Plaintiff's parents met him at the emergency room.  (N. Ainsworth dep. at 87:10-12.) Deputy Inabinett also went to the emergency room.  (Inabinett aff. at ¶¶ 84-85.)  Mr. Ainsworth glared at Deputy Inabinett when he entered the Plaintiff's room and continued to do so when

---

[13]  Again, the Plaintiff and his family's version of the treatment the Plaintiff received is not supported by the evidence in the record.  They allege that the medical staff in the emergency room did not examine the Plaintiff.  (N. Ainsworth dep. at 88:9-11; J. Ainsworth dep. at 98:20-23; B. Ainsworth dep. at 58:6-12.)  As noted above, however, the contemporaneously created medical records indicate otherwise.  Moreover, Mr. and Mrs. Ainsworth admit that they were not in the room with the Plaintiff the entire time he was in Andalusia Regional.  (B. Ainsworth dep. at 58:16-19; J. Ainsworth dep. at 98:21-99:23.)  Mr. Ainsworth's objection also seems to be primarily directed at the staff's failure to take x-rays of the Plaintiff although there is no evidence whatsoever that the Plaintiff suffered any injury that would have been revealed by an x-ray.  (B. Ainsworth dep. at 58:20-59:6; J. Ainsworth dep. at 100:20-23.)  Mrs. Ainsworth concedes that an examination could have been conducted while she was out of the room making telephone calls.  (J. Ainsworth dep. at 100:13-16.)

Deputy Inabinett remained in the room.  Id. at ¶ 86.  Deputy Inabinett asked Mr. Ainsworth if he wanted to go outside and speak with him.  (Inabinett aff. at ¶ 87; Video at p. 13.)  Mr. and Mrs. Ainsworth became agitated again and began arguing with Deputy Inabinett about the charges against the Plaintiff.  (Inabinett aff. at ¶ 88; Video at p. 13.)  Deputy Inabinett told them they would have to settle down or leave, and Mrs. Ainsworth told her husband to sit down.  (Inabinett aff. at ¶¶ 89-90; Video at p. 13.)

Despite the Plaintiff's family's overt hostility towards him, Deputy Inabinett continued to try to work with the Plaintiff and his family.  Deputy Inabinett told the Plaintiff that he had spoken with his juvenile probation officer and that they agreed detention was not the best thing for him.  (Video at p. 15.)  Deputy Inabinett told the Plaintiff the two charges he had arrested him for were just misdemeanors, that he would still have to see his probation officer, and he would not have much to do other than to go to Laurel Oaks.  Id.[14]  Deputy Inabinett later told Mrs. Ainsworth that he was not going to take the Plaintiff to jail.  Id.  He further stated that if he was the probation officer, he would rather have the Plaintiff stay in the hospital than go to jail.  Id. at p. 16.  He told Mrs. Ainsworth that other than taking the Plaintiff to Dothan, they were going to try to work everything out.  Id.  Mrs. Ainsworth acknowledged that she had been told the same thing.  Id.

The Plaintiff was at Andalusia Regional Hospital between 45 minutes and over an hour. (N. Ainsworth dep. at 84:22-85:1; J. Ainsworth dep. at 101:1-6.)    He was released to an ambulance to take him to Laurel Oaks.  (J. Ainsworth dep. at 102:1-3.)  The trip from Andalusia Regional to Laurel Oaks took approximately 90 minutes.  Id. at 103:9-16.

---

[14] At the time, Deputy Inabinett thought the Plaintiff was going to be admitted to Andalusia Regional, but that turned out to not be the case.  (Compare Video at p. 15 with N. Ainsworth dep. at 84:22-85:11.)

Upon his arrival at Laurel Oaks, the Plaintiff was evaluated again and a diagram was completed indicating wounds on the Plaintiff's body.   (Exhibit N, PBF Form 1097 for Christopher Ainsworth, dated 7/13/05, "Laurel Oaks Injury rec.")  As noted by Nurse N. Leach of Laurel Oaks, at 9:30 p.m. on July 13, 2005, the Plaintiff had:

- Two TASER marks in the same areas indicated previously;

- Four bruises: one on the right side of his neck, one on his left knee, and two near the left center of his back;

- The previously noted abrasion to the Plaintiff's forehead from the four-wheeler accident;

- Two 1/2-inch cuts on his left hand from glass;

- A one-inch cut on his left forefinger from tin; and

- An old scar on his right knee.

Id.   The Plaintiff was admitted to Laurel Oaks for treatment and stayed for fourteen to eighteen days.  (See generally 7/13/05 Laurel Oaks recs.; N. Ainsworth dep. at 90:18-91:1; B. Ainsworth dep. at 65:16-22.)

## IV.    THE PLAINTIFF'S LEGAL STATUS AFTER JULY 13, 2005.

As set forth above, the Plaintiff was charged with obstruction of governmental operations and resisting arrest.  As of the filing of this brief, those charges remain pending.  (J. Ainsworth dep. at 111:6-112:3.)  The Plaintiff's defense attorney has gotten the case continued repeatedly because the Plaintiff has been "agitated, scratching and rocking."  Id. at 111:21-112:3.  Three months after the incident with Deputy Inabinett, the Plaintiff had to be taken to the Andalusia Regional Hospital emergency room when he beat himself in the head with a VCR.  (Exhibit O, 10/8/05 Andalusia Regional Hospital Records for Christopher Neal Ainsworth, "10/8/05 ER recs." at p. 3.)

According to Mrs. Ainsworth, the Plaintiff's trial may also have been continued due to the Plaintiff becoming involved in another domestic violence situation. (J. Ainsworth dep. at 113:19-23.) Approximately three months after hitting himself in the head with a VCR, the Plaintiff became agitated again and cut his brother, Robert, on the arm with a knife. (Exhibit P, Psychological Specialties Forensic Evaluation Report for Christopher "Neal" Ainsworth dated 4/19/06, "Competency rep." at p. 1.) Robert and the Plaintiff got into an argument and someone mentioned taking the Plaintiff back to Laurel Oaks. (R. Ainsworth dep. at 65:1-6.) When Robert attempted to grab the Plaintiff, the Plaintiff pulled out a steak knife and cut Robert on his right arm in the bicep area. Id. at 65:7-11, 66:17-18, 67:3-4. The wound required 44 stitches to close. Id. at 66:21-23.

As a result of his assault on his younger brother, the Plaintiff was charged with Second and Third Degree Domestic Violence and booked into the Covington County Jail. (Exhibit Q, Covington County Jail Inmate Data Form, dated January 11, 2006, "Inmate data"; Exhibit R, Alabama Uniform Arrest Report, Case No. 060100309.) The Plaintiff was subsequently convicted as an adult and served 30 days in the Covington County Jail. (N. Ainsworth dep. at 16:16-19:11.) He is currently on probation from that conviction as well. Id. at 93:22-94:7.

## ARGUMENT

Federal Rule of Civil Procedure 56 governs motions for summary judgment: "A party against whom a claim … is asserted … may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof."

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c).

"The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed. R. Civ. P. 56(e).

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

> Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

Celotex, 477 U.S. at 327.

On a motion for summary judgment, the court should view the evidence in the light most favorable to the non-movant. Greason v Kemp, 891 F.2d 829, 831 (11th Cir. 1990). However, a plaintiff "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Only reasonable inferences with a foundation in the record inure to the non-movant's benefit. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000). "[T]he court should give credence to the evidence favoring the non-movant as well as that 'evidence supporting the moving party

that is uncontradicted or unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" Reeves, 530 U.S. at 151, quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p. 299.[15]  "A reviewing court need not 'swallow plaintiff's invective hook, line and sinker; bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like need not be credited.'"  Marsh v. Butler County, 268 F.3d 1014, 1036 n.16 (11th Cir. 2001) (en banc) (quoting Massachusetts School of Law v. American Bar, 142 F.3d 26, 40 (1st Cir. 1998)).

Deputy Inabinett is entitled to judgment in his favor as a matter of law on the Plaintiff's excessive force claim because he is entitled to qualified immunity.  Once a defendant has asserted the defense of qualified immunity, the threshold inquiry a court must undertake is whether the plaintiff's allegations, if true, establish a constitutional violation.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  This initial inquiry is whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  Id.  (citing Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  The second inquiry is, if a constitutional violation is stated, were these rights "clearly established" to the degree that Deputy Inabinett had "fair warning" that his conduct violated the Plaintiff's constitutional rights?  Willingham v. Loughnan, 321 F.3d 1299, 1301 (11th Cir. 2003).

In making an assessment of whether the particular conduct of Deputy Inabinett was clearly established as being violative of constitutional dictates, the reviewing court must examine the state of law at the time the alleged deprivation occurred.  See Rodgers v. Horsley, 39 F.3d 308, 311 (11th Cir. 1994).  A constitutional right is clearly established only if its contours are "sufficiently clear

---

[15] Although Reeves was a review of a motion for judgment as a matter of law after the underlying matter had been tried, the Supreme Court, in determining the proper standard of review relied heavily on the standard for summary judgment stating, "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'"  Reeves, 530 U.S. at 150, citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-251 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

that a reasonable official would understand that what he is doing violates that right." <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987); <u>Lancaster v. Monroe County</u>, 116 F.3d 1419, 1424 (11th Cir. 1998). "In this circuit, the law can be 'clearly established' for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." <u>Jenkins v. Talladega Board of Education</u>, 115 F.3d 821, 827 (11th Cir. 1997) (<u>en banc</u>) (citations omitted).

Deputy Inabinett is entitled to qualified immunity for three reasons. First, the undisputed evidence in the record shows that Deputy Inabinett was acting within his discretionary authority. Second, the Plaintiff cannot meet his burden of showing a constitutional violation. Third, even if the evidence in the record did show a constitutional violation, the Plaintiff cannot point to any contemporaneous clearly established law that provided Deputy Inabinett with "fair warning" that his conduct was illegal.

## I.    DEPUTY INABINETT ACTED WITHIN HIS DISCRETIONARY AUTHORITY.

As set forth by the Eleventh Circuit, once a public official has asserted the defense of qualified immunity, he bears the burden of proving that he was acting within his discretionary capacity. <u>Rich v. Dollar</u>, 841 F.2d 1558, 1563 (11th Cir. 1988). In order to establish that he is acting within his discretionary capacity, a public official asserting qualified immunity need only show "objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." <u>Id.</u> at 1564 (quoting <u>Barker v. Norman</u>, 651 F.2d 1107, 1121 (5th Cir. 1981)). Courts should not be "overly narrow" in interpreting this requirement. <u>Jordan v. Doe</u>, 38 F.3d 1559, 1566 (11th Cir. 1994). To determine this question "a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's

discretionary duties." <u>Harbert International., Inc. v. James</u>, 157 F.3d 1271, 1282 (11th Cir. 1998) (citation omitted). As one district court observed, "the determination that an officer was acting within his discretionary authority is quite a low hurdle to clear." <u>Godby v. Montgomery County Bd. of Educ.</u>, 996 F. Supp. 1390, 1401 (M.D. Ala. 1999).

As made clear by the record before the Court, Deputy Inabinett was acting within his discretionary authority. Deputy Inabinett's was on duty as a Covington County Deputy Sheriff and dispatched to the Plaintiff's home as a result of a 911 call placed by Janet Ainsworth. Deputy Inabinett's actions were taken as a Covington County Sheriff's deputy. He would not have been in the Plaintiff's home or interacted with the Plaintiff at all but for his duties as a Sheriff's deputy. It is clear that a deputy's duties include responding to 911 calls and assisting persons who are suicidal or otherwise in distress. It is within a deputy's duties to make arrests and use force to effectuate an arrest when the subject resists. As Deputy Inabinett engaged in the aforementioned actions while on duty and in response to a dispatch call, he clearly was within his discretionary authority at all times relevant to the Plaintiff's Second Amended Complaint. <u>Mercado v. City of Orlando</u>, 407 F.3d 1152, 1156 (11th Cir. 2005) (holding that "[b]ecause the defendant [officers] were trying to apprehend a potentially suicidal subject, they were clearly engaged in a discretionary capacity").

## II.    DEPUTY INABINETT DID NOT VIOLATE ANY OF THE PLAINTIFF'S FEDERALLY PROTECTED RIGHTS.

The test for determining whether an officer has applied excessive force in the course of seizing a person is the "objective reasonableness" test. <u>Graham v. Connor</u>, 490 U.S. 386, 395 (1989). Under <u>Graham</u>, this Court should determine the "objective reasonableness" of Deputy Inabinett's actions by balancing the "nature and quality of the intrusion" against the "governmental interest at stake." 490 U.S. at 396. Whether a specific use of force is objectively

reasonable turns on several factors including the severity of the crime, whether the suspect poses an immediate threat, and whether the suspect is resisting or fleeing. Graham, 490 U.S. at 394; Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir.1993). In the Eleventh Circuit, the extent of the injury inflicted is another factor to consider. Leslie v. Ingram, 786 F.2d 1533, 1536 (11th Cir.1986).

The actions of the officer must be reasonable in light of the facts and circumstances confronting the officer, without regard to his underlying intent or motivation. Graham, 490 U.S. at 397. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Id. at 396-97. The Eleventh Circuit has added "[w]e must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction would prove fatal." Crosby v. Monroe County, 394 F.3d 1328, 1333-34 (11th Cir. 2004).

"In analyzing whether excessive force was used, courts must look at the totality of the circumstances." Garrett v. Athens-Clarke County, 378 F.3d 1274, 1280 (11th Cir. 2004). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Graham, 490 U.S. at 396 (citation omitted). "We must look at the situation not with hindsight, but with the eye of the objectively reasonable officer on the scene." Garrett, 378 F.3d at 1281. "Graham requires an evaluation of the officers' reasonable

apprehension to assess their responses to the circumstances confronting them, particularly in a rapidly evolving situation."  Carr v. Tatangelo, 338 F.3d 1259, 1268 n.17 (11th Cir. 2003).

"Government officials are not required to err on the side of caution."  Marsh v. Butler County, 268 F.3d 1014, 1030 n.8 (11th Cir. 2001) (en banc).  "Reconsideration will nearly always reveal that something different could have been done if the officer knew the future before it occurred.  This is what we mean when we say we refuse to second-guess the officer."  Carr v. Tatangelo, 338 F.3d 1259, 1270 (11th Cir. 2003) (citation omitted).  "We must avoid substituting our personal notions of proper police procedure for the instantaneous decision of the officer at the scene.  We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day."  Smith v. Freland, 954 F.2d 343, 347 (6th Cir. 1992).  "The Constitution simply does not require police to gamble with their lives in the face of a serious threat of harm."  Elliott v. Leavitt, 99 F.3d 640, 641 (4th Cir. 1996).

Deputy Inabinett is accused of using excessive force against the Plaintiff when Deputy Inabinett struck him and used a TASER.  Even viewing the facts in the record in the light most favorable to the Plaintiff leads one to the inevitable conclusion that Deputy Inabinett did not violate the Fourth Amendment.  First, Deputy Inabinett's actions did not violate the Fourth Amendment.  Second, the *de minimis* nature of the Plaintiff's injuries demonstrate that he was not subjected to excessive force.

A.    Under **Graham**, Deputy Inabinett did not Use Excessive Force.

As noted previously, the non-exhaustive list of factors set forth by the United States Supreme Court in Graham include the severity of the crime, the threat posed by the subject to the officer, and the degree of flight or resistance displayed by the subject.  490 U.S. at 394.  In addition, the totality of the circumstances of this case require the Court to consider additional information as well.  Garrett, 378 F.3d at 1280.  Specifically, the Court should take into account the threat of self-harm posed by the Plaintiff, and Alabama's statutory authority granting law enforcement officers the authority to use force to prevent suicides.

1.    **The Graham analysis justifies the force used by Deputy Inabinett.**

As noted previously, the excessive force calculus calls for a balancing of the government's interest and the nature and quality of the intrusion into the individual's rights. Graham, 490 U.S. at 396.  Inherent in this analysis is an identification of the relevant factors to be considered in order to determine the governmental interest at stake.  Id.  Balanced against the interest is the force used by the officer – the nature and quality of the intrusion.  Here, the balancing of governmental interest and the force used, leads to the inevitable conclusion that Deputy Inabinett did not use excessive force as a matter of law.

a.    All of the factors in **Graham** are relevant to the instant case.

In this case, there are two governmental interests at issue: (1) prevention of a juvenile suicide; and (2) crime prevention.  The first Graham factor is the severity of the crime and does not lend itself very well to the first interest.  However, the Plaintiff in this case was charged with two crimes that remain pending, and therefore analysis of the severity of the crime is required.[16]

---

[16] An analysis taking into account the governmental interest in preventing suicide follows in section II A 2 of this brief.

It is important to note that the standard for including a particular crime does not turn on a level of proof equivalent to that necessary to obtain a conviction for the crime. For qualified immunity to apply, all that is required is ***arguable*** probable cause that the offense has been committed. <u>See</u> <u>Jones v. Cannon</u>, 174 F. 3d 1271, 1283 (11th Cir. 1999). Probable cause is arguable if a reasonable officer, given his knowledge of the facts and circumstances, could have believed probable cause existed to make a warrantless arrest. <u>Cannon</u>, 174 F.3d at 1283. Moreover, police officers are not expected to be trained lawyers. It is "'unfair and impracticable' to hold public officials to the same level of knowledge as trained lawyers." <u>Lassiter v. Alabama A & M Bd. of Trustees</u>, 28 F. 3d 1145, 1152 n.8 (11th Cir. 1994) (abrogated on other grounds by <u>Hope v. Pelzer</u>, 536 U.S. 730, 739 (2002), quoting <u>Davis v. Scherer</u>, 468 U.S. 183, 196 n.13 (1984)). "Arguable probable cause does not require an arresting officer to prove every element of a crime or to obtain a confession before making an arrest, which would negate the concept of probable cause and transform arresting officers into prosecutors." <u>Scarbrough v. Myles</u>, 245 F.3d 1299, 1302-03 (11th Cir. 2001).

Under Alabama law it is a crime to obstruct governmental operations and resist arrest – the two offenses charged by Deputy Inabinett. A person commits the crime of obstructing governmental operations if he uses intimidation, physical force, or any other unlawful act to obstruct the administration of law, other governmental function, or a public servant from performing a governmental function. ALA. CODE § 13A-10-2. Obstructing governmental operations is a Class A misdemeanor. <u>Id.</u> Resisting arrest is a Class B misdemeanor and is committed when a person intentionally prevents or attempts to prevent a peace officer from lawfully arresting him or another person.

Deputy Inabinett and the other first-responders involved in this incident were on the scene because the Plaintiff had attempted to commit suicide and his mother called for help. The Plaintiff exacerbated the situation by violently resisting his parents and threatening to stab and hit anyone who tried to take him out of the house. As noted in Deputy Inabinett's affidavit, the rescue squad could not enter the trailer to assist the Plaintiff until it was safe for them to do so. (Inabinett aff. at ¶ 46.) The Plaintiff's actions in refusing to cooperate with Chief Anderson and Deputy Inabinett obstructed not only their efforts to secure the scene, but the ambulance crew's efforts to help the Plaintiff. The Plaintiff's refusal to come with the officers and active resistance to their efforts to physically remove him from the bed provides a prima facie case of resisting arrest.

There were other crimes for which the Plaintiff could have been charged during this incident based upon information known to Deputy Inabinett when he decided to use force against the Plaintiff. Deputy Inabinett was informed on at least two occasions by the E911 dispatchers that the Plaintiff was "fighting" with his parents. This information, combined with the Plaintiff's violent and combative attitude, speech, and conduct, could have led a reasonable officer to believe that he was dealing with a potential felony assault or felony domestic violence situation. See, e.g., ALA. CODE §§ 13A-6-21 (Assault in the Second Degree), 13A-6-131 (Domestic Violence – Second Degree). Deputy Inabinett was also informed by E911 that the Plaintiff was threatening officers, and the Plaintiff threatened to hit Deputy Inabinett if he came across the bed. These acts would justify a reasonable officer to conclude that the Plaintiff had committed multiple counts of Criminal Coercion. ALA. CODE. § 13A-6-25. Accordingly, the severity of the crimes at issue in this case, viewed from the prospective of the reasonable officer having the

same information as Deputy Inabinett, cover the gamut of violent misdemeanors up to felonious assaults.

There is one final matter that the Court should consider with respect to the crime factor – the Plaintiff was on probation.  As noted in the Statement of Facts, at all times relevant, the Plaintiff was on probation for threatening to shoot his mother with a gun.  The Plaintiff's behavior, fighting with his parents, threatening law enforcement, threatening his family, and committing further crimes, are probation violations.  In fact, the Plaintiff's mother voiced this concern repeatedly during the encounter.  (See generally Video.)

The Plaintiff, as well as his family, posed a significant risk of harm to Deputy Inabinett and Chief Anderson.  The two peace officers were alone in the room with the Plaintiff with the Plaintiff's family at their back.  The Plaintiff was openly hostile, had threatened to hit and stab law enforcement before Deputy Inabinett arrived, and threatened to hit Deputy Inabinett if he came near.  Experience and training had shown Deputy Inabinett that family members could turn on him with little to no warning.  Mrs. Inabinett was clearly agitated and emotional.  Mr. Inabinett wound up having to be restrained to stop him from interfering.  Deputy Inabinett and Chief Anderson were alone in the room with a violent, foaming-at-the-mouth young man to their front and an irate family to their rear.  Moreover, the Plaintiff was on probation from his previous threat to use a gun against his mother and stated he knew where one was in the trailer. That gun could have been recovered and used by any of the Ainsworths against the officers.

It is undisputed that Deputy Inabinett felt threatened by the situation.  He testified in his affidavit that he thought the Plaintiff posed a significant danger to himself and Chief Anderson based upon the Plaintiff's violent and irrational behavior.  (Inabinett aff.at ¶ 41.)  The behavior of the family also increased Deputy Inabinett's apprehension.  Id. at ¶ 43.  His training and

experience taught him that domestic calls were of the type that could unexpectedly become violent with "victims" suddenly turning on law enforcement officers. <u>Id.</u> at ¶ 44. He was concerned, essentially, that he and Chief Anderson, already outnumbered two to one, were surrounded with no safe way to retreat if it became necessary. <u>Id.</u> at ¶ 45.

It is simply beyond dispute that the Plaintiff was resisting. He refused to let go of the headboard. He refused to obey commands to come with the officers. He ignored two warnings that a TASER would be used if he did not comply. He physically resisted Deputy Inabinett and Chief Anderson's attempts to pry him loose from the headboard. He also kicked at Deputy Inabinett. As noted by all of the participants, the Plaintiff was incredibly strong, and this became readily apparent to Deputy Inabinett when he tried to pry the Plaintiff's hands and arms away from the headboard.

**b.    The type of force used and resulting injuries show that the force employed by Deputy Inabinett was slight.**

The force used by Deputy Inabinett in this case was minimal and escalated based upon the Plaintiff's resistance. It consisted first of verbal commands. When that proved ineffective, a threat to use force (i.e., the TASER) was attempted. As the Plaintiff was undaunted by the TASER, Deputy Inabinett and Chief Anderson next tried to pull the Plaintiff's hands off the headboard. Failing in that effort, Deputy Inabinett next attempted nerve strikes. Although partially effective, the nerve strikes did not have the desired effect of enabling the officers to take the Plaintiff off the bed. Consequently, Deputy Inabinett – following an imperative statement from Chief Anderson to do so – stepped up the force continuum to the use of the TASER. A single five-second discharge of the TASER brought the situation to a conclusion without further injury to the Plaintiff or anyone else.

The wounds received by the Plaintiff are also a testament to the relatively slight degree of force employed by Deputy Inabinett. The only injuries clearly inflicted by Deputy Inabinett were the TASER wounds. No reasonable jury could conclude that the bruises on the Plaintiff's body were caused by Deputy Inabinett. As is made clear by the video, Deputy Inabinett would have had to move across the bed, land the two blows he made to the Plaintiff's arm, and make the blows claimed by the Plaintiff (a blow to the neck, a blow to the knee, kicks to the Plaintiff's back) within a period of *six seconds*.

Counterpoised against this impossible feat is the undisputed evidence of the Plaintiff's attempt to choke himself with the belt, his brother and father's two-to-three minute struggle to remove the belt, and their eleven minute, 27 second struggle to restrain the violently resisting Plaintiff. With respect to the bruise on the Plaintiff's neck, the evidence is undisputed that he choked himself with a leather belt wrapped around his neck for several minutes before any law enforcement officer arrived. As violently as the Plaintiff was pulling on the belt as evidenced by the testimony of his father and brother relating their struggle to remove the belt, any bruising would have had to have come from the Plaintiff's suicide attempt. Moreover, the bruises on the Plaintiff's back could not have been caused by Deputy Inabinett because, as demonstrated by the Plaintiff himself in a picture taken by his mother, the Plaintiff's back was to the wall at the time he was holding on to the headboard. (J. Ainsworth dep. at Ex. 6.)

This leaves only one bruise – the one on the Plaintiff's knee – as even possibly being caused by Deputy Inabinett. However, there is no evidence anywhere in the record that Deputy Inabinett ever struck the Plaintiff in the leg, and there is undisputed evidence in the record that the Plaintiff fought with his father and brother, that the Plaintiff kicked at someone before law enforcement arrived, and that Robert Ainsworth held his son down by the legs.

There is also undisputed evidence that the Plaintiff ran a four-wheeler into a tree and sustained injuries two weeks prior to this event. Furthermore, it bears repeating that the Plaintiff violently resisted his family and had to be forcibly restrained before law enforcement ever arrived for over eleven minutes. The Plaintiff's contention that the four bruises were inflicted during Deputy Inabinett's six-second struggle with the Plaintiff is absolutely preposterous. The undisputed physical evidence in this case does not support the Plaintiff's assertion that the bruises on the Plaintiff's body were caused by Deputy Inabinett. Accordingly, the Court should not find, even on summary judgment, that the bruises were the result of Deputy Inabinett's conduct. Kesinger, 381 F.3d at 1249.

Even if the Court accepts as a given that the TASER marks and all of the bruises are attributable to Deputy Inabinett's conduct, they show a lack of any serious degree of force. The Andalusia Regional Hospital emergency room personnel found them to be so insignificant that they were not even worthy of mention or treatment. (See generally 7/13/05 ER recs.) The Plaintiff did testify that the TASER wounds required treatment and later became infected. However, there is also undisputed testimony in the record that the Plaintiff healed slowly because he picked at his wounds as a manifestation of his mental instability. Consequently, any infection in a TASER wound is not attributable to the force employed by Deputy Inabinett, but rather to the physical manifestations of the Plaintiff's various psychological disorders.

   c.   **As a matter of law, the Plaintiff was not subjected to excessive force under Graham, because the slight force used by Deputy Inabinett was reasonable in light of the relevant Graham factors.**

The Plaintiff, a potential perpetrator of one or more felonious assaults, posed a significant risk of harm to Deputy Inabinett, Chief Anderson, and the Plaintiff's family. The risk of harm to the officers was exacerbated by the nature of the call and the increasing hostility of the Plaintiff's

family.  The Plaintiff actively resisted attempts to restrain him, which led only to greater hostility being directed towards the officers by the Plaintiff and his family.  In response, Deputy Inabinett progressively used verbal commands, attempted to pull the Plaintiff's hands from the headboard, attempted nerve-strikes, and finally used the TASER to employ a single five-second discharge.

Nerve-strikes have been upheld as reasonable force to obtain a resisting suspect's compliance.  In Bond v. Queen, a police officer used a knee strike to the plaintiff's common peroneal (a nerve in the leg) to force a *handcuffed* and resisting suspect to get into a police car. 71 F.Supp.2d 1117, 1120 (D.Kan. 1999).  The Court granted the officer's motion for summary judgment on the plaintiff's excessive force claim.  Id. at 1124.

The Plaintiff in the instant case, like the Plaintiff in Bond, was resisting Deputy Inabinett's efforts to bring him under control.  Unlike the plaintiff in Bond, the instant Plaintiff still had free use of his hands which he used to resist the officer's efforts to remove him from the bed.  A reasonable officer in Deputy Inabinett's position could have determined that nerve-strikes were reasonable to obtain the Plaintiff's compliance – particularly in light of the threat from the Plaintiff and his family, and the need to secure the scene so the Plaintiff could be given medical assistance.  Other courts have reached similar conclusions.  See, e.g., Atkins v. Township of Flint, 2004 WL 1103979, *1, 4 (Mich. App. 2004) (affirming summary judgment and finding that officer who used OC spray and three successive nerve-strikes with a baton on a suspect who was resisting being handcuffed did not use excessive force).

With respect to the TASER, the Eleventh Circuit recently has ruled that its use on a non-complying motorist was not an excessive use of force.  Draper v. Reynolds, 369 F.3d 1270 (11th Cir. 2004).  In Draper, the plaintiff truck driver was stopped by the defendant officer for an equipment violation.  The officer asked five times for the driver to produce various documents

including registration and the driver's log book.  During this time, the driver was yelling and verbally abusive to the officer but did not attack him.  Without warning or announcing that the driver was under arrest, the officer then discharged his TASER into the driver.  369 F.3d at 1272-74.  In finding that the officer did not use excessive force and was entitled to qualified immunity, the Eleventh Circuit stated "[a]lthough being struck by a taser gun is an unpleasant experience, the amount of force [the officer] used – a single use of the taser gun causing a one-time shocking – was reasonably proportionate to the need for force and did not inflict any serious injury."  Id. at 1278.

The Plaintiff in this situation posed an even more significant threat than the motorist in Draper.  In addition to being combative, the instant Plaintiff threatened to hit Deputy Inabinett and attempted to kick him before Deputy Inabinett used the TASER.  Deputy Inabinett – like the trooper in Draper – used a single discharge of the TASER to end the situation and employed no further force once the threat was gone.  Unlike the trooper in Draper, Deputy Inabinett was outnumbered two to one.

Specifically relating to what a reasonable officer would do under this situation, *all* the evidence in the record from the involved law enforcement officers and officials supports Deputy Inabinett's use of the TASER.  The E911 dispatcher specifically told Deputy Inabinett "I hope you got your TASER."  (Radio traffic at p. 5.).  Before Deputy Inabinett deployed the TASER, David Anderson – *an officer with 26 years of experience* – told Deputy Inabinett to use the TASER stating: "Get him.  Light him up."  (Anderson aff. at ¶¶ 2, 22; Video at p. 3.) Interestingly, Chief Anderson is the officer that the Plaintiff has continuously asserted was the reasonable officer throughout this litigation.  (See, e.g., Doc. 1 at ¶¶ 17, 19, 28; Doc. 26 at ¶¶ 16, 18, 27.)  A reasonable officer with *far* more experience than Deputy Inabinett facing the same

situation that Deputy Inabinett was facing came to the same conclusion and made an imperative statement for Deputy Inabinett to take the action he took.

As a matter of law, the balancing test contained in <u>Graham</u> weighs conclusively in Deputy Inabinett's favor. The severity of the Plaintiff's crimes, the threat to the officers, and the Plaintiff's active resistance all justified the gradually escalating force used by Deputy Inabinett. Consequently, even if the Court were to consider only the factors enumerated in <u>Graham</u>, Deputy Inabinett would be entitled to judgment in his favor as a matter of law on the Plaintiff's excessive force claim.

> **2.**     <u>**Additional factors support finding that Deputy Inabinett did not use excessive force.**</u>

The totality of the circumstances require the Court to go beyond the <u>Graham</u> analysis to consider other aspects of the situation confronting Deputy Inabinett that further justify the force he employed. Specifically, the Court should consider the governmental interest in preventing a 16-year old young man from committing suicide. Alabama law justifies the use of force in preventing suicide, so it clearly has expressed an interest in preventing them. <u>See</u> ALA. CODE § 13A-3-24(4).

Deputy Inabinett respectfully submits to the Court that in conducting its analysis of the reasonableness of his conduct, it take into consideration two additional factors. First, the Plaintiff had already attempted suicide, and his continued behavior posed a significant risk of harm to himself. Concomitantly, as just noted, Alabama law explicitly permits the use of force to prevent suicide.

While the Plaintiff's first suicide attempt of the day had been prevented by the family, there was no guarantee that he would not make another. It is undisputed that the Plaintiff had a significant history of diagnosed psychosis and attempts at self-harm. Deputy Inabinett's

presence in the Plaintiff's home was due to his latest attempt to kill himself. Despite the efforts of the Plaintiff's family and Chief Anderson, the Plaintiff was still in an agitated and excited state upon Deputy Inabinett's arrival.

The Plaintiff continued to behave in an irrational and self-destructive manner by disregarding warnings from Deputy Inabinett regarding the TASER. The belt that the Plaintiff had used previously was still on the bed. From his position on the bed, the Plaintiff could have attempted to regain control of the belt, bashed his head against the metal headboard (as he did later with the VCR), or attacked one or both of the officers in an attempt at "suicide by cop". In fact, he did threaten to hit Deputy Inabinett. This conduct convinced Deputy Inabinett that the Plaintiff was still a danger to himself.

Alabama law also explicitly authorizes the use of force to stop suicide attempts. ALA. CODE § 13A-3-24(4). Specifically, the Alabama Code authorizes "a person acting under a reasonable belief that another person is about to commit suicide or to inflict serious physical injury upon himself may use reasonable physical force upon that person to the extent that he reasonably believes it necessary to thwart the result." Id. The clear text of the Code does not limit its applicability to cases involving suicide but also includes cases in which a person is attempting to inflict serious harm upon himself. Id.

Deputy Inabinett believed that the Plaintiff was a significant danger to himself. (Inabinett aff. at ¶ 41.) His belief was supported by the Plaintiff's just stopped suicide attempt and the Plaintiff's continued irrational behavior. Id. His efforts, from officer presence up to the use of the TASER, represented a progressively escalating response to the threat posed by the Plaintiff to himself. Deputy Inabinett's efforts were authorized by Alabama law.

When these facts are added to the scales of <u>Graham</u>, already tilting heavily in Deputy Inabinett's favor, the result is unavoidable. Deputy Inabinett acted properly under the circumstances. That is, the reasonable officer with the information possessed by Deputy Inabinett would have believed the level of force employed by Deputy Inabinett was necessary. <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1197 (11th Cir. 2002).

Eleventh Circuit precedent also mandates judgment in Deputy Inabinett's favor. In <u>Wood v. City of Lakeland</u>, five police officers were confronted with a suspect who had attempted suicide. 203 F.3d 1208, 1292-93 (11th Cir. 2000). The decedent in <u>Wood</u> had cut himself with a box cutter prior to the officer's arrival. <u>Id.</u> at 1292. When the decedent quickly slid off of a dresser and came towards the officers, the defendant officer fired his service weapon three times, killing the man. <u>Id.</u> at 1293. As set out by the Eleventh Circuit, at the time of the shooting, the defendant officer knew that the decedent was a drug addict, had attempted suicide in the past, refused to comply with officer's instructions to drop the box cutter, and hurled obscenities at the officers. <u>Id.</u> at 1292. Under these circumstances, the Eleventh Circuit found that the defendant officer was entitled to qualified immunity and ***reversed*** the district court's decision to deny the officer's summary judgment motion.

In the case at bar, Deputy Inabinett had similar information but used a great deal less force. The Plaintiff was in a similar state as the decedent in <u>Wood</u>. Both had just failed at a suicide attempt. Both had attempted suicide in the past. The decedent in <u>Wood</u> was a drug addict; the instant Plaintiff had a history of mental disorders and was being treated with psychotropic drugs. Both refused to follow the instructions of officers. Both shouted obscenities at the officers. If the defendant officer in <u>Wood</u> "acted as a reasonable officer would in light of the facts and circumstances facing him at the time" in ***shooting and killing a suicidal subject***,

Deputy Inabinett's nerve strikes and TASER deployment cannot be said to be excessive.  203 F.3d at 1293.

The differences in the two cases also weigh heavily in Deputy Inabinett's favor.  In Wood, there were five officers who were part of a trained SWAT-style team, whereas Deputy Inabinett only had Chief Anderson to assist him.  203 F.3d at 1290.  The officer in Wood fired three shots that killed Mr. Thomas.  Deputy Inabinett, at great risk to himself, employed nerve-strikes and a single shot from his TASER.  Of course, the most important difference is that the instant Plaintiff is alive today thanks in large part to the heroic actions of Deputy Inabinett.  The *decedent* in Wood had to bring suit through his next of kin.

Deputy Inabinett clearly did not use excessive force.  Therefore, the Plaintiff cannot meet his burden of establishing a violation of his federally protected rights.  As a matter of law, Deputy Inabinett is entitled to qualified immunity and judgment in his favor.

**B.    The Plaintiff's Injuries Were *de minimis*.**

The *de minimis* nature of the Plaintiff's alleged injuries also mandates judgment in Deputy Inabinett's favor as a matter of law.  Nolin v. Isbell, 207 F.3d 1253, 1257 (11th Cir. 2000) (holding that the application of *de minimis* force will not support a claim for excessive force in violation of the Fourth Amendment.)  In Nolin, the defendant officer grabbed the plaintiff from behind by the shoulder and wrist, threw him against a van three or four feet away, kneed him in the back, pushed his head into the side of the van, searched his groin area in an uncomfortable manner, and placed the plaintiff in handcuffs.  207 F.3d at 1255.  The plaintiff allegedly suffered **bruising** to his forehead, chest, and wrists.  Id.  Here, the Plaintiff suffered no more, if not less, harm than the Nolin plaintiff, and the mechanics of the force used are clearly

less likely to cause serious harm (i.e., the use of a TASER and nerve strikes on the Plaintiff as opposed to slamming Mr. Nolin's head into a van).

There is no evidence that the Plaintiff suffered anything more than what amounts to pinpricks and a 5-second exposure to the TASER, along with two blows to the arms. The entire physical altercation with Deputy Inabinett and Chief Anderson lasted a mere six seconds, making the entire period over which Deputy Inabinett used force against the Plaintiff **eleven seconds**. Looking at the evidence in the light most favorable to the Plaintiff and giving him the benefit of even unreasonable inferences, the only injuries he suffered were the aforementioned pinpricks and four bruises. In light of Nolin and Draper, the Plaintiff's injuries were *de minimis* as a matter of law.

## III.  NO CLEARLY ESTABLISHED LAW PROVIDED FAIR WARNING TO DEPUTY INABINETT THAT HIS CONDUCT WAS ILLEGAL.

Assuming, *arguendo*, that the Plaintiff could demonstrate a constitutional violation, he must still show that clearly established law provided Deputy Inabinett with fair warning that his conduct was unlawful. The Plaintiff may do so by either (1) pointing to a case with materially similar facts holding that the conduct engaged in was illegal; or (2) demonstrating that a pertinent federal statute or federal constitutional provision are specific enough to demonstrate conduct was illegal, even in the total absence of case law. Storck v. City of Coral Springs, 354 F.3d 1307, 1317 (11th Cir. 2003) (citations omitted). The Eleventh Circuit has identified the latter method as an "obvious clarity" case. Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir. 2002) (footnote omitted). In order to show that the conduct of Deputy Inabinett was unconstitutional with "obvious clarity," "the unlawfulness must have been apparent." Willingham, 321 F.3d at 1301. "Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent

officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit." <u>Storck</u>, 354 F.3d at 1318 (quoting 28 F.3d at 1149).

The cases involving materially similar facts (e.g., <u>Nolin</u>, <u>Wood</u>, and <u>Draper</u>) indicate that Deputy Inabinett did not violate the Plaintiff's clearly established rights.  In light of this precedent, the Plaintiff is not going to be able to provide the Court with a materially similar case holding that what Deputy Inabinett did violated clearly established law.  Consequently, the Plaintiff has the burden of demonstrating that this is an obvious clarity case.

As demonstrated by the arguments above, this is simply not an obvious clarity case.  In particular, the <u>Draper</u> decision authorized some of the very force applied in this case under circumstances that were far less compelling.  <u>Nolin</u> holds that *de minimis* injuries like those allegedly suffered by the Plaintiff cannot result in § 1983 liability.  Furthermore, the general excessive force analysis contained in <u>Graham</u> is intensely fact sensitive and does not lend itself to obvious clarity resolution.  Consequently, even if the evidence in the record demonstrated a constitutional violation, the Plaintiff cannot show that clearly established law provided Deputy Inabinett with the requisite fair warning that his conduct violated the Plaintiff's constitutional rights.

## CONCLUSION

Based upon the foregoing, Covington County Deputy Sheriff Chris Inabinett requests that the Court issue an order granting him judgment in his favor as a matter of law on the Plaintiff's remaining excessive force claim and grant unto him costs and attorneys' fees in accordance with 42 U.S.C. § 1988.

Respectfully submitted, this 28th day of July, 2006.

**s/Gary L. Willford, Jr.**
DARYL L. MASTERS – Bar No. MAS018
GARY L. WILLFORD, JR. – Bar No. WIL198
Attorneys for Defendant
WEBB & ELEY, P.C.
7475 Halcyon Pointe Road (36117)
Post Office Box 240909
Montgomery, Alabama  36124
Telephone:  (334) 262-1850
Fax:  (334) 262-1889
E-mail:  gwillford@webbeley.com

## CERTIFICATE OF SERVICE

I hereby certify that on this the 28th day of July, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:  **Jay B. Lewis, Esq., and Keith A. Nelms, Esq.**

**s/Gary L. Willford, Jr.**
OF COUNSEL