# EXHIBIT J

## Affidavit of Chris Inabinett

Exhibit A, True and correct copy of the case file prepared as a result of the incident that forms the basis of the Plaintiff's Second Amended Complaint.

Exhibit B, Recording of the Covington County public safety radio traffic – filed conventionally

Exhibit C, Transcript of the radio traffic made using Deputy Inabinett's personal knowledge and review of the radio traffic recording

Exhibit D, Copy of the video taken from Deputy Inabinett's dashboard video system during the incident underlying the Plaintiff's Second Amended Complaint – filed conventionally

Exhibit E, Transcript of the video taken from Deputy Inabinett's dashboard video system madethat is based upon the personal knowledge of both Deputy Inabinett and Chief Anderson and will be cited to by Deputy Inabinett in this brief.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| N.A., et al., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 2:05-cv-740-DRB |
| | ) |
| DEPUTY CHRIS INABINETT, | ) |
| | ) |
| Defendant. | ) |

## AFFIDAVIT OF CHRIS INABINETT

| | |
|---|---|
| STATE OF ALABAMA | ) |
| | ) |
| COUNTY OF COVINGTON | ) |

**BEFORE ME**, the undersigned authority and Notary Public in and for said County and State at large, personally appeared Chris Inabinett, who being known to me and being by me first duly sworn on oath deposes and says as follows:

1. My name is Chris Inabinett. The following statements are based upon my personal knowledge.

2. At all times relevant to the Plaintiff's Second Amended Complaint, I was a Deputy for the Covington County Sheriff's Department. I served in that capacity from December 2003 to January 2006.

3. I left the Covington County Sheriff's Department when I accepted a posting as an Agent for the Alcoholic Beverage Control Board (hereinafter "ABC"). In that capacity, I am a sworn law enforcement officer for the State of Alabama.

1

4. I graduated from the Southwest Alabama Police Academy in 2000 and became certified as a peace officer by the Alabama Peace Officers Standards and Training Commission (hereinafter "APOST"). I have been continuously certified as a peace officer in Alabama since.

5. I am also a graduate of the ABC Training Academy.

6. I have reviewed the Plaintiff's Second Amended Complaint filed in this matter. I have personal knowledge of the facts stated in the Second Amended Complaint.

7. Attached as Exhibit A to this affidavit is a true and correct copy of the case file prepared as a result of the incident that forms the basis of the Plaintiff's Second Amended Complaint. Said file and the contents thereof were prepared/obtained and kept by me in the regular course of business of the Covington County Sheriff's Department.

8. On July 13, 2005, I was on duty as a deputy with the Covington County Sheriff's Department. At approximately 2:47 p.m., I received a call from dispatch to respond to the Ainsworth residence regarding an attempted suicide. Attached as Exhibit B is a true and correct recording of the radio traffic that took place over the Covington County public safety radio frequency during the date and time relevant to this lawsuit.

9. Attached as Exhibit C is a true and correct transcript of the same radio traffic contained in Exhibit B. Identification of the voices contained on Exhibit B is based upon my personal knowledge. I am familiar with and recognize the voices of all the persons heard on the recording.

10. The information contained in brackets are explanatory in nature and where used reflect the identities of particular units and the meaning of code phrases. Blank lines reflect inaudible communications.

11. My call sign was "2316".

12. On July 13, 2005, David Anderson was the Chief of the City of Red Level Police Department. His call sign was "501".

13. "2302" was the Chief Deputy of the Covington County Sheriff's Department, Walter Inabinett.

14. "2303" was my supervisor, Lieutenant Howard West.

15. "2306" was Covington County Investigator Elliot King.

16. "2307" was Covington County Investigator Scott Connor.

17. "2308" was Covington County Investigator Wayne Spoon.

18. "Command" refers to the dispatch center. Any operator working at the center at the time would have been referred to as "Command".

19. A "signal 25" is a code phrase that was used at the time to indicate a suicide attempt.

20. References to "IRT" on the radio traffic CD mean the Covington County Incident Response Team. The IRT is a law enforcement tactical unit whose members come from various law enforcement agencies in Covington County. The IRT was used for high risk operations such as narcotics search warrants, hostage situations, suicides, and similar incidents.

21. Times stated in the radio traffic are in military time.

22. While en route, I was informed by Command that the Plaintiff was fighting with his family as they fought to hold him down.

23. I was also informed that the Plaintiff was threatening violence towards law enforcement officers. In fact, Command told me, "I hope you got your TASER."

24. The Chief Deputy also called for all units to turn their dashboard video cameras on. I complied and a true and correct copy of the video tape made by my dashboard camera is

attached to my affidavit in DVD format as Exhibit D. This video was made and kept in the regular course of my duties as a Covington County Sheriff's deputy.

25. Attached as Exhibit E to my affidavit is a true and correct transcript of the audio portion of Exhibit D. Identification of the voices contained on Exhibit D is based upon my personal knowledge.

26. Chief Anderson was the first law enforcement unit to arrive at the Plaintiff's home. He arrived at 2:56 p.m.

27. I was the next law enforcement officer on the scene, and arrived at 2:57 p.m.

28. My immediate concern upon arrival was for Chief Anderson's safety. I knew he was in the home alone with the Plaintiff and his family. Furthermore, I was aware of the information Command had provided regarding the Plaintiff's threats to law enforcement and other first responders.

29. When I got out of my car I had my M-26 Advanced TASER in my right hand. The M-26 TASER is as large as a full-sized Glock automatic handgun and its frame is made of a black polymer. To prevent the device being misidentified as a handgun, it had yellow markings on it. I did not have a holster for the TASER on my duty belt and had to carry it in my hand if I wanted it with me.

30. Based upon my knowledge of the Plaintiff and the information relayed to me by Command, I believed that it was necessary to have the TASER.

31. I yelled for Chief Anderson, while I was still outside the trailer. Receiving no response, I went around to the back of the Plaintiff's trailer. Seeing no one there, I ran around to the front door of the trailer. I still had not heard from Chief Anderson since his arrival.

32. When I entered into the living room area of the trailer through the front door, I was immediately confronted by Janet Ainsworth. Looking past her, I could see Mr. Ainsworth was also in the living room seated in a chair.

33. Mrs. Ainsworth told me that everything was OK. I told her to move and asked her about Chief Anderson's whereabouts. Mr. Ainsworth told me that he was in Neal Ainsworth's room and indicated where it was.

34. I walked across the living room to an open door that Mr. Ainsworth had pointed towards. As I approached, I could see Chief Anderson inside the room.

35. I also saw Neal Ainsworth. Neal was sitting on a bed that was pushed up against a wall in the far corner of the room. The bed had a metal frame headboard that Neal was holding on to with both hands.

36. As I entered the room, I asked Neal, "What's up, man?" I stopped next to Chief Anderson on his right hand side.

37. Neal responded that he was not going anywhere.

38. Both Chief Anderson and I said "come, on Neal."

39. In response, Neal began using profanity and repeated that he was not going anywhere.

40. While this was going on, the Plaintiff appeared to be foaming at the mouth. He had a wild look on his face. He glared at Chief Anderson and myself and said we were going to have to "choke him down" because he was not going anywhere.

41. Based upon the Plaintiff's violent and irrational behavior, I concluded that the Plaintiff posed a significant danger to himself as well as Chief Anderson and I. As a result, I issued the Plaintiff his first warning that I would use the TASER that was in my hand.

42. The Plaintiff responded that I would not shoot him with the TASER.

5

43. Janet Ainsworth, the Plaintiff's mother, was behind me, became emotional, and asked me not to use the TASER. Her demeanor only increased my concerns regarding the volatility of the situation.

44. In both my training and experience, I have learned that domestic situations can rapidly escalate and explode into violent confrontations with little to no warning. Family members who call for help can, and often do, turn on officers who were summoned to help them.

45. In this situation, I had a clearly violent and unstable subject to my front, and at least three members of his family at my back. Their position cut off my only line of retreat if it became necessary.

46. Accordingly, based upon my training, experience, and the information I had at the time, I decided to end the situation as quickly as I possibly could, and get the Plaintiff out of the residence. Furthermore, the Andalusia Rescue ambulance crew could not, and would not, treat the Plaintiff until the scene was secure.

47. I issued the Plaintiff his second warning that I would use the TASER.

48. I could see that the Plaintiff was a young man, although he appeared to weigh as much or more than I. I asked him how old he was, but he did not respond.

49. Chief Anderson's attention left the Plaintiff as he tried to reassure Janet Ainsworth that the TASER would not harm Neal. However, she became even more emotional and this, in turned, appeared to aggravate the Plaintiff even more. He reiterated that he was not going anywhere and appeared to tighten his grip on the headboard.

50. Janet Ainsworth asked her son to not make me shoot him with the TASER, but he still refused to come off the bed. She became even more hysterical as she implored her son to comply with our instructions. She also stated that Neal had mental problems.

51. I decided to try again to get Neal to comply. I tucked the TASER into my back pocket so I had nothing in my hands and began moving forward and to my right so that I ended up at the foot of his bed. My intent was to try to talk him off the bed, and if that failed, to get into a position where Chief Anderson and I could try to pry his hands off of the headboard and remove him from the house.

52. Neal's attention was focused on me as I moved. He slipped one leg between the bed and the wall so that he was in a semi-standing position. Still, he maintained his grip on the headboard.

53. As I moved, I ordered Neal to "come on" four times and he refused to come off the bed.

54. Turning his attention back to Neal, Chief Anderson gave the Plaintiff two orders to get up and come on. Neal refused.

55. The last time I told Neal to "come on", I was at the foot of his bed. Neal looked at me and said, "Don't come across the bed, 'cause I'll have to hit ya."

56. Chief Anderson and I moved simultaneously. He came across the bed and tried to grab one of the Plaintiff's arms and pull it from the bed. I came across the foot of the bed, and grabbed the Plaintiff's other arm.

57. Chief Anderson and I tried unsuccessfully for several second to pry the Plaintiff's hands off of the headboard. The Plaintiff was very strong and we were unable to get the Plaintiff's hands free.

58. Seeing that we were not going to be able to make the Plaintiff let go of the headboard by simply pulling on his arms, I attempted a nerve-strike technique I learned in the academy. Using my fist, I struck twice at the Plaintiff's arms in the area of a nerve that is located on the forearm below the elbow. A strike of sufficient force on the nerve will cause a

temporary numbness that would have enabled us to pry the Plaintiff's hand loose. My first strike was to the Plaintiff's left arm and he let go of the headboard with that arm. My second strike to the Plaintiff's right arm was unsuccessful as the Plaintiff maintained his hold on the bed with his right hand.

59. Janet Ainsworth became even more emotional. I heard her yell "no!"

60. Realizing we were not succeeding in removing the Plaintiff from the bed, and not wanting to continue using further blunt force on the Plaintiff, Chief Anderson and I backed off the bed.

61. Chief Anderson told me to "light him up", which meant to use the TASER on him.

62. I withdrew my TASER, turned it on, aimed it at the Plaintiff and fired.

63. I am a certified TASER instructor and am very familiar with the use and operation of the device.

64. In this incident, I used the TASER with a cartridge on the front. The cartridge fires two probes that are the equivalent of a straightened number 2 fishhook. The probes are connected to the TASER by two thin wires that deliver electricity from the TASER, through the probes, and into the subject's body.

65. When the trigger is pulled on the TASER, in addition to firing the probes (if a cartridge is attached), the device delivers a five-second discharge of electricity at .0036 amps. The TASER will deliver the electricity for the full five-seconds, regardless of whether the user continues to depress the trigger. The cycle can be interrupted by turning the TASER's safety on, and thus turning the TASER off.

66. In this incident, I used a cartridge and depressed the trigger one time. When I did so, the two probes from the TASER hit the Plaintiff in the upper left arm and left side. The Plaintiff received a five-second discharge from the TASER.

67. When the probes hit the Plaintiff, he finally turned loose of the headboard. I instructed the Plaintiff to lay down on his belly so he could be handcuffed.

68. The Plaintiff finally complied with my instructions and Chief Anderson put handcuffs on him.

69. The Plaintiff's mother became upset and I had to warn her to stay back so I could do my job.

70. The Plaintiff did not put up any further struggle after he was handcuffed and I used no further force against him, other than to guide him by his arm to my patrol car, and eventually, the ambulance.

71. As we left the Plaintiff's trailer, I began to reassure him that he was going to be fine and that we would get him checked out.

72. I took the Plaintiff in front of the dashboard camera that was mounted in my patrol car. The Plaintiff can be seen on the video with the TASER probes still in him. I left the probes in the Plaintiff so that I could, if necessary, discharge the TASER again to control him.

73. In front of the camera, I informed the Plaintiff that he was under arrest for obstruction of governmental operations and resisting arrest.

74. I then took the Plaintiff back to the ambulance that came in after we secured the scene.

75. Before the probes were removed by the ambulance crew, I warned the Plaintiff again that he would be subjected to the TASER again if he became unruly again. This was necessary because of my concern that he would harm the ambulance crew and force me to shoot

9

him with a fresh cartridge. Fortunately, the Plaintiff made no further attempts to resist and the ambulance crew was able to treat the areas where the probes entered the Plaintiff's skin and take him to Andalusia Regional Hospital.

76. The Plaintiff's mother came out to the ambulance in an agitated state. I tried to calm her and reassure her that her son would be fine. I was concerned that her attitude would further upset the Plaintiff and cause him to become combative again.

77. To get her mind on other things and to take her out of her son's presence, I asked Mrs. Ainsworth to come back into her trailer and tell me about what happened. Mrs. Ainsworth took me and several deputies back into the trailer.

78. Mr. Ainsworth was in the kitchen where I went to wash my hands. I told Mr. Ainsworth that I hope he understood that we did what we had to do. Mr. Ainsworth told me that he understood that we did what we had to do.

79. The investigators had Mrs. Ainsworth in the Plaintiff's discussing with her what had happened.

80. I spoke to Mrs. Ainsworth about working with the Plaintiff's probation officer and the court about helping the Plaintiff.

81. Mrs. Ainsworth was concerned that the new charges would result in a probation revocation. She stated that she had just called for an ambulance.

82. One of the investigators told her that whenever someone tries to take their life, law enforcement gets involved.

83. At this point, Mr. and Mrs. Ainsworth both became upset. Mr. Ainsworth asked me who I was. I told him my name. Mr. Ainsworth became very angry. He said my father had arrested him before for no reason. From that point forward, Mr. Ainsworth was very hostile towards me.

84. I left the trailer and went to the Andalusia Regional Hospital Emergency Room.

85. When I arrived, the Plaintiff was already in a room with his mother and father.

86. Mr. Ainsworth glared at me when I entered and continued to do so while I was in the room.

87. I told Mr. Ainsworth that if he wanted to discuss anything with me, we could step outside and talk about it.

88. Both Mr. and Mrs. Ainsworth became agitated again. Mr. Ainsworth said he did not want to discuss anything and Mrs. Ainsworth asked me to leave the room.

89. I informed her that the Plaintiff was under arrest and my presence was necessary. I also told her that because this was a hospital, if she became disruptive, she would have to leave.

90. Mrs. Ainsworth told her husband to sit down and he did so.

91. The Plaintiff was evaluated by the medical staff at the hospital. They examined him and ran some tests.

92. Once the Plaintiff's parents calmed down, I tried again to explain to them what could be done to assist the Plaintiff.

93. I remained at the hospital until the Plaintiff was released to go to Laurel Oaks Behavioral Health Center in Dothan, Alabama.

94. As of the date of this affidavit, the charges against the Plaintiff remain pending.

95. However, he has subsequently been convicted of an assault on his brother. The Plaintiff cut his brother across the arm with a knife. It is my understanding that the Plaintiff was charged as an adult and served thirty days in the Covington County Jail.

96. I swear, to the best of my present knowledge and information that the above statements are true, that I am competent to make this affidavit, and that the above statements were made by drawing from my personal knowledge of the situation.

Executed on this the 25 day of July, 2006.

_____
CHRIS INABINETT

**SWORN TO** and **SUBSCRIBED** before me this 25 day of July, 2006.

_____
NOTARY PUBLIC

My Commission Expires: 1-29-09