# EXHIBIT K

**Affidavit of David Anderson**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| N.A., et al., | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
| v. | )   Civil Action No. 2:05-cv-740-DRB |
| | ) |
| DEPUTY CHRIS INABINETT, | ) |
| | ) |
|     Defendant. | ) |

### AFFIDAVIT OF DAVID ANDERSON

STATE OF ALABAMA     )
    )
COUNTY OF COVINGTON     )

**BEFORE ME**, the undersigned authority and Notary Public in and for said County and State at large, personally appeared David Anderson, who being known to me and being by me first duly sworn on oath deposes and says as follows:

1. My name is David Anderson. I am over the age of nineteen and competent to make this affidavit.

2. I am of the Red Level Police Department Chief of Police. I have served in this capacity for 14 years and have been in law enforcement for 26 years.

3. On July 13, 2005 I was dispatched from Covington County 911 to a call of an attempted suicide to a residence on Sweatt Lane. The residence is in Covington County outside of the jurisdiction of any city or municipality. I responded, however, because I was the closest unit at the time.

1

4. While I was responding I received updated information from 911 because Mrs. Ainsworth remained on the line with the 911 operator. Attached as Exhibit A is a true and correct transcript of the audio recording of the radio traffic that took place during the call to the Ainsworth residence. My call sign was "501" and Deputy Inabinett's call sign was "2316".

5. I arrived at the scene at approximately 2:56 p.m. and found Mrs. Ainsworth on the front porch. She was on the telephone with the 911 operator at the time.

6. I was familiar with the Ainsworth family prior to this time. I and several of my officers had been involved in approximately three other calls involving the Ainsworth's 16 year-old son Neal. I am aware of another call approximately one week prior in which Neal was arrested by Covington County Sheriff's deputies.

7. Neal was a troubled child that I had met several times in the Red Level school system prior to the incident that forms the basis of Neal's lawsuit. Neal had the potential to snap unexpectedly and become violent.

8. On previous occasions at the Ainsworth house, the family showed me damaged items that they said Neal had caused.

9. I asked Mrs. Ainsworth what was going on. She responded that Neal and her husband Bobby were fighting in Neal's bedroom. She said she did not know what was wrong with Neal, but that he had become violent and tried to hang himself with a belt.

10. I entered the house and went to Neal's bedroom. Mr. Ainsworth and Neal's brother were struggling with Neal on a bed. All three individuals were on the bed. I asked Mr. Ainsworth and the brother to leave the room and they complied.

11. Neal was standing in a gap between the bed and the wall. He had a strong grip on the headboard of his bed. He maintained the grip on the headboard until later Deputy Inabinett and I forcibly removed him from it.

2

12. I saw a belt on the bed and moved it out of the way.

13. I spoke with Neal in an attempt to calm him down. He spoke to me and relaxed some, but was still agitated. He never relaxed his grip on the headboard.

14. Approximately one to two minutes after I began talking to Neal, Covington County Deputy Chris Inabinett arrived in the room.

15. Attached to my affidavit at Exhibit B is a true and correct transcript of an audio recording of what transpired in Neal's room. The recording that Exhibit B is based upon comes from Deputy Inabinett's body microphone that was linked to his dashboard video camera system. I am familiar with, and recognize the voices on the tape. Their identities are reflected accurately on Exhibit B.

16. There is one point on the transcript that does need to be clarified. Immediately after Neal tells us that we were going to have to choke him down, I said "Come on, Chris." This statement was directed at the Plaintiff. I knew the Plaintiff as Christopher Neal Ainsworth and was using "Chris" to refer to him, and not Deputy Inabinett. It was one of many verbal attempts on my part to get the Plaintiff to cooperate with us and leave the residence.

17. Deputy Inabinett and I repeatedly asked and ordered Neal to get off the bed and come with us. He refused.

18. Neal stated that he was not going anywhere.

19. Deputy Inabinett warned the Plaintiff two times that he was going to be shot with the TASER if he did not cooperate. The Plaintiff still refused to cooperate, going so far as to tell Deputy Inabinett that he was not going to shoot the Plaintiff with the TASER.

20. In addition to our repeated verbal efforts to get the Plaintiff to cooperate, Deputy Inabinett and I went on the bed in an effort to pry the Plaintiff's hands loose from the head board. We were unsuccessful in pulling the Plaintiff's hands off the headboard. The Plaintiff was

3

incredibly strong. Deputy Inabinett tried two nerve strikes on the Plaintiff's arm but they had no effect.

21.  Finally, the Plaintiff began kicking at Deputy Inabinett and we backed off.

22.  At that point, as reflected in the transcript, I told Deputy Inabinett, "Get him. Light him up." By this, I meant for Deputy Inabinett to use his TASER on the Plaintiff.

23.  Deputy Inabinett pulled his TASER and fired it at the Plaintiff. The two probes hit the Plaintiff in his left upper arm and left side. The TASER discharged for 5 seconds. The Plaintiff received one five-second TASER discharge.

24.  Deputy Inabinett ordered the Plaintiff to get on his belly and I was able to handcuff the Plaintiff.

25.  During this time, the Plaintiff's family, his father, mother, and younger brother, were right outside the bedroom in the trailer living room. The mother, in particular, was extremely emotional and was clearly angry that we had to use force to remove her son from the bed.

26.  Mr. Ainsworth, on the other hand, told Deputy Inabinett after the incident that we did what we had to do. However, when he found out that Deputy Chris Inabinett was the son of Chief Deputy Walter Inabinett, his entire attitude changed. He stated that Chief Deputy Inabinett had arrested him previously. Mr. Ainsworth became visibly angry after that point and remained that way the entire time I was present.

27.  We walked Neal through the living room past the rest of the Ainsworth family. The probes were still in Neal and Deputy Inabinett was still holding the Taser.

28.  As we walked, Deputy Inabinett tried to reassure both the Plaintiff and his family that the Plaintiff was fine and would be taken care of.

29. We took Neal outside of the home and stopped briefly in front of Deputy Inabinett's dashboard camera. At that time, Deputy Inabinett told the Plaintiff he was under arrest for obstruction of governmental operations and resisting arrest. While I did not arrest Neal on those charges, I would have had the event taken place within my jurisdiction.

30. We then took him to a waiting ambulance crew. The ambulance had also been dispatched as part of the original call.

31. The ambulance crew removed the probes from Neal and transported him to Andalusia Regional Hospital. He was transported because of the original suicide call and to receive any necessary treatment due to his exposure to the Taser.

32. Deputy Inabinett did not tell the family that he was taking Neal to jail and not the hospital.

33. Since July 13, 2005, I have responded on two other occasions to the Ainsworth residence. Both occasions involved Neal becoming violent.

34. The first time Neal became unruly. A report was taken but Neal was not arrested.

35. The second time, Neal again became violent. Neal cut his brother on the arm. Mr. Ainsworth also had cuts on him but claimed that Neal did not do it. Neal was charged as an adult with Second Degree Domestic Violence and Third Degree Domestic Violence. He was eventually convicted and spent thirty days in the Covington County Jail.

36. I swear, to the best of my present knowledge and information that the above statements are true, that I am competent to make this affidavit, and that the above statements were made by drawing from my personal knowledge of the situation.

Executed on this the _25_ day of July, 2006.

_____
DAVID ANDERSON

**SWORN TO** and **SUBSCRIBED** before me this _25_ day of July, 2006.

_____
NOTARY PUBLIC

My Commission Expires: _1-29-09_

6