UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| N.A., a minor who sues by and through | ) | |
| Janet Ainsworth, his mother and next | ) | |
| friend | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | 2:05-CV-740-DRB |
| | ) | WO |
| DEPUTY CHRIS INABINETT, in his | ) | |
| individual capacity, | ) | |
| | ) | |
| *Defendant.* | ) | |

## MEMORANDUM OPINION AND ORDER

This 42 U.S.C. § 1983 complaint of Fourth Amendment-barred excessive force arises from

an encounter between Covington County Deputy Sheriff Chris Inabinett ("Defendant") and N.A.,

then a sixteen-year old boy ("Plaintiff"), whose mother, Janet Ainsworth  ("Mrs. Ainsworth")

summoned law enforcement officers to their residence in response to the boy's attempted suicide.

In a *Memorandum Opinion and Order* filed February 7, 2006 (Doc. 30), the court granted defendants'

Fed. R. Civ.P 12(b)(6) dismissal motions, grounded on qualified immunity, on all claims asserted by

Ainsworth but denied the similarly grounded motion on the boy's claim against the deputy sheriff in

his individual capacity.[1]

On July 28, 2006, Deputy Sheriff Inabinett, the sole remaining defendant, filed his *Motion*

*for Summary Judgment* (Doc.37) along with a memorandum brief and evidentiary materials as support

(Docs. 38, 39).  Upon Plaintiff's failure to file any response in opposition, Defendant filed a *Reply*

---

[1]This claim of "unreasonable force" comprises Count II of the Second Amended Complaint
(Doc. 26), ¶¶ 55-65 at 7-8.

*Brief* (Doc.42, Aug. 31, 2006) to highlight the unopposed nature of his motion.[2]   Following due

consideration of summary judgment motion, the evidentiary record, and applicable law, the court

concludes and explains herein that the requested summary judgment is appropriate.


## I.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.

P. 56(c).   The party seeking summary judgment "always bears the initial responsibility of informing

the district court of the basis for its motion, identifying those portions of "the pleadings and

evidentiary record" which it believes demonstrate the absence of a genuine issue of material fact."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *see also Fitzpatrick v. City of Atlanta*, 2 F.3d 1112,

1116 (11th Cir. 1993) (discussing burden-shifting under Rule 56).   In response to a properly

supported motion for summary judgment, the "adverse party may not rest upon the mere allegations

or denials of the adverse party's pleading, but the adverse party's response, by affidavits, or as

---

[2]Defendant also argues, citing *Greenbriar Ltd. v. City of Alabaster* 881 F.2d 1570, 1573 n.6
(11th Cir. 1989) that "Plaintiff's failure to file an opposition brief constitutes a waiver of his claim
against Deputy Inabinett." Lack of opposition to a summary judgment motion, however,  does not
authorize its grant for that reason; instead, the court  is required to examine  the merits of the motion.
See *Trustees of Central Pension Fund v. Wolf Crane Service, Inc.*, 374 F. 3d 1035, 1039(11th Cir.
2004) ( "summary judgment cannot be granted as a sanction for merely failing to file a response to
a motion for summary judgment");  *United States v. One Piece of Property, 5800 S.W. 4th Ave.,
Miami, Florida*, 363 F.3d 1099 (11th Cir. 2004) ("The district court cannot base the entry of summary
judgment on the mere fact that the motion was unopposed but, rather, must consider the merits of
the motion.")

otherwise provided .... must set forth specific facts showing that there is a genuine issue for trial."
Fed. R. Civ. P. 56(e).

## II.   UNDISPUTED FACTUAL BACKGROUND

The court finds the relevant facts both undisputed by Plaintiff and amply supported by
evidentiary materials filed with Defendant's summary judgment motion.

Upon noticing her sixteen- year old, mentally unstable son's "distressed state" in his bedroom
after "wrapp[ing] a belt around his neck and ...choking himself with it" in the afternoon of July 13,
2005, Ainsworth made an emergency call for immediate dispatch of a rescue squad and "told the
911 operator that her son had just tried to choke himself."[3] The Complaint describes N.A. as "a
troubled young man with a diagnosed history of mental illness and instability which is largely
controlled by medication," and reports that "[t]he fact of that mental illness is well known to the
Sheriff's Department of Covington County, as deputies have been dispatched to N.A.'s home on
several occasions to assist the family in administering medication to him."[4]

Defendants have filed extensive medical records which document his significant history of
diagnosed  mental illnesses – including  – Bipolar II Disorder (with possible psychotic features),
Conduct disorder, Oppositional Defiant Disport, and antisocial personality traits – as well as previous

---

[3]*Compl.* ¶¶ 8-9.  All references to the Complaint relate to the *Second Amended Complaint*
allowed for filing on January 6, 2006 (Doc. 26).

[4]*Id.*

3

suicide attempts and other episodic manifestations of his illness.[5]  Also documented on this summary judgment record is the Plaintiff's threat – made barely six months before the July 2005 incident – to kill his mother with a gun located inside the family's home; this threat resulted in his arrest for Third Degree Assault Violence, for which Plaintiff received probation still active on the incident underlying this litigation. [6]

Deposition testimony by the Plaintiff's parents confirm the triggering event for the episode which resulted in the summoning of officers to their home on July 13, 2005: his arguments with them upon being confronted about his failure to take his medications.  In response to his mother's reported attempt to get him admitted into a treatment facility, Plaintiff retreated to his bedroom, where he sat on his bed with his back against the wall near the foot of the bed, placed a leather belt around his neck, running the loose end through the buckle, and began choking himself for ten to fifteen seconds.[7]  His brother Robert found him, and after alerting his mother and with assistance from his father, struggled for about two minutes to prevent the suicide attempt; they witnessed Plaintiff either foaming at the mouth or vomiting.  Notwithstanding Plaintiff's physical and verbal resistance, they managed to secure him lying down on the bed with his head near the headboard and his feet near the foot of the bed.

A Covington County emergency line dispatcher responded to Mrs. Ainsworth's call by sending to her home an Andalusia Rescue Unit Squad, Deputy Inabinett, Red Level, Alabama Chief

---

[5]*See* Laurel Oaks Behavioral Health Center Records (*Exs.* A and C); Excerpts of Deposition of Janet Ainsworth (*Ex.* B); Excerpts of Deposition of Robert Ainsworth, Sr. (*Ex.* E).

[6]*See Ex.* A and  *Ex.* F, Alabama Uniform Incident/Offense Report, Case No. 051100208.

[7]*Def.'s Br.* at 5, citing from the depositions of Plaintiff and his parents.

of Police David Anderson, and several other county law enforcement officers.  The transcript of the

emergency call captured Plaintiff's continuing resistance to his parents' summons for help[8] and

documents graphically that Plaintiff's physical resistance increased during the approximate lapse of

eleven minutes until the very moment of the Deputy's arrival with other rescue officers.[9]

---

[8]Apparently overhearing his mother's request for a "rescue squad [because he] tried to hang himself", Plaintiff emphatically declared to her, "I'm not going" and commenced to increase his belligerence with his father's and brother's efforts to restrain, to the extent of inflicting injury to his father.  Though she remained on the phone with the emergency dispatcher, Mrs. Ainsworth tried to calm her son, to dissuade him from hurting his father and brother, and to reinforce his need for hospitalization.  When Plaintiff demands that she put down the phone, she responds: "No, I've got to hold it.  Neal, it's the rescue squad.  What I'm calling is the rescue squad.  You've got to have help."  Ignoring his mother's pleas for his cooperation, Plaintiff threatened: "When they come, I'm going to hit them and hit everybody else, you got to hold . . . I ain't going back to jail . . . I'm gonna punch 'em in the face.  I'm telling you. . . . They can't take me out of here.  They better have some guns, stun guns, They better have a bulldozer."

In response to the emergency operator's inquiry, "tell me what's going on", Mrs. Ainsworth offered: "He's just laying here fighting us ."  As Ainsworth provided requested information to the emergency operator, Plaintiff's rants became more threatening, profane, and hostile (e.g., "[t]hey ain't gonna calm me if they ain't got a bullwhip.") , prompting the operator to assure Ainsworth that help is enroute and to caution Ainsworth to watch Plaintiff's breathing and make sure he did not choke on his vomit.

*See Ex.* I at 1-8.

[9]The following colloquy illustrates the ongoing battle up to the officers' arrival:

911 Operator:          They're coming to you, OK?

Janet Ainsworth:       All right.

Plaintiff:             Where are they at so I can go ahead and get up here from the bed?

Janet Ainsworth:       You . . . Wipin' under your nose and around your mouth.  Be still.

Plaintiff:             I don't care what I have.

Janet Ainsworth:       You smell like vomit Neal.  Stop.

(continued...)

5

[9](...continued)

Robert Ainsworth Jr.: I got him, mama.

Janet Ainsworth:        Stop Neal.
***
                        No. I'm gonna ... you're going to stay still.

Plaintiff:              I'll get ya.

Janet Ainsworth:        Nuh oh, Neal.

Plaintiff:              I'll show you what I'm gonna do.

Janet Ainsworth:        Neal.  They are right here now.
Robert Ainsworth Jr.: You can't do that.

911 Operator:           They're coming to you.

Janet Ainsworth:        Neal. Neal.

Robert Ainsworth Jr.: Come on Neal.

Janet Ainsworth:        Stop Neal.  Neal, stop.

Robert Ainsworth Sr.:Neal...

Janet Ainsworth:        Stop!

Robert Ainsworth Jr.: Come on, Neal.

Janet Ainsworth:        You gotta . . . Neal stop.

Robert Ainsworth Sr.:Stop it now.

Janet Ainsworth:        Stop Neal.  Stop Neal.

Robert Ainsworth:       Neal.  Nuh uh, don't break that.

Janet Ainsworth:        Nuh uh.

911 Operator:           What's he doing, honey?

                                        (continued...)

6

The fact of Plaintiff's physical battle with his parents was communicated by the emergency

---

[9](...continued)

Robert Ainswoth Sr.:  Neal!

Janet Ainsworth:      He's fightin'.

Robert Ainsworth Sr.:Neal!

Janet Ainsworth:      Oh God.

Robert Ainsworth Sr.:Oh~

911 Operator:         OK. [following beeping of phone twice]

Janet Ainsworth:      Stop it.  They're right here.  They out here.

Robert Ainsworth:     Quit.  Quit~

Plaintiff:            Y'all, stop~

911 operator:         OK, I've got an officer there, baby.

Robert Ainsworth Sr.  Grab that.

Janet Ainsworth:      Need help?  Hold him down.

911 Operator:         OK, he's coming to you.  He's at your yard.  Can he get in?  Can the officer come in?

Janet Ainsworth:      Yes, please hurry.

911 Operator:         David Anderson is in the front yard now.

Janet Ainsworth:      Yes, I see him.  OK, he's here.

911 Operator:         OK.

Janet Ainsworth:      He's tried to hang himself and he's vomited on us in here.  OK, he's here, thank you, ma'am.

*Ex.* I at 12-14 and *Ex.* A  (audio tape of E911 call,  filed on July 28, 2006, as  Doc. 39).

7

operator over the Covington County public safety radio and thereby heard by Defendant; a female command reported Plaintiff's attempted suicide and his "threatening violence toward officers" while a male command added, "hope you got your TASER...they're still fighting with him . . Units responding, be advised, the subject's fighting with them again now."[10]   Defendant responded with inquiries about the need for an additional unit and about any weapons used by Plaintiff.[11]

Familiar with Plaintiff and his family through similar incidents at the residence, Chief David Anderson arrived with the first emergency unit and received a report from Mrs. Ainsworth before entering Plaintiff's bedroom to find him still struggling with his father and brother, who acquiesced in the Chief's request that they leave.   Alone with Plaintiff for one to two minutes, the Chief attempted to calm him.

The events which unfolded upon Defendant's arrival within a minute or so are documented by consistent testimony from Chief Anderson and Deputy Inabinett as well as the video taken from the Defendant deputy's dashboard video system, which included a remote body microphone worn by the deputy to enable the video system to record audio anywhere the deputy went. [12]   Reflecting his priority concern for Chief Anderson's safety, Defendant – holding his M-26 Advanced TASER gun in his right hand – did not linger with Mrs. Ainsworth standing in the front doorway but instead rushed in the direction specified pointed as his location.   Approaching Plaintiff's bedroom, he saw

---

[10]*Def.'s Br.* at 13.

[11]*Ex.* J, Affidavit of Chris Inabinett ("Inabinett Aff.") and attached  *Ex.* B (audio tape of radio traffic) and *Ex.* C (transcript of radio traffic).

[12]*See* Inabinett Aff. (*Ex.* J) , and Anderson Aff. (*Ex.* K); Radio Traffic disk (*Ex.* B to Ex. J); Dashboard video disk and transcript(Exs. D and E to Ex. J).   The court bases its summary of these events on a reading of all this relevant evidence.

the Chief and Plaintiff "sitting on a bed that was pushed up against a wall in the far corner of the

room . . . holding on to the metal frame headboard railing with both hands." Defendant recalled as

follows the next occurrence:

> As I entered the room, I asked Neal, "What's up, man?" I stopped next to Chief
> Anderson on his right hand side. Neal responded that he was not going anywhere.
> Both Chief Anderson and I said, "come on Neal." In response, Neal began using
> profanity and repeated that he was not going anywhere. While this was going on, the
> Plaintiff appeared to be foaming at the mouth. He had a wild look on his face. He
> glared at Chief Anderson and myself and said we were going to have to "choke him
> down" because he was not going anywhere. Based upon Plaintiff's violent and
> irrational behavior, I concluded that the Plaintiff posed a significant danger to himself
> as well as Chief Anderson and I. As a result, I issued the Plaintiff his first warning
> that I would use the TASER that was in my hand. The Plaintiff responded that I
> would not shoot him with the TASER. Janet Ainsworth, the Plaintiff's mother, was
> behind me, became emotional, and asked me not to use the TASER. Her demeanor
> only increased my concerns regarding the volatility of the situation.
> In both my training and experience, I have learned that domestic situations can
> rapidly escalate and explode into violent confrontations with little to no warning.
> Family members who call for help can, and often do, turn on officers who were
> summoned to help them. In this situation, I had a clearly violent and unstable subject
> to my front, and at least three members of his family at my back. Their position cut
> off my only line of retreat if it became necessary. Accordingly, based upon my
> training, experience, and the information I had at the time, I decided to end the
> situation as quickly as I possibly could, and get the Plaintiff out of the residence.
> Furthermore, the Andalusia Rescue ambulance crew could not, and would not, treat
> the Plaintiff until the scene was secure. I issued the Plaintiff his second warning that
> I would use the TASER.[13]

Notwithstanding the two warnings, Plaintiff remained belligerent and more aggravated as his

mother's emotional response to the situation heightened. Defendant then " tucked the TASER into

[his] back pocket" and tried without luck to cajole Plaintiff into submission; after ignoring four

orders from Defendant and two from Chief Anderson to come off the bed, Plaintiff threatened to hit

---

[13]Inabinett Aff.  ¶¶ 36-47.

Defendant if he ventured to move him.  The officers' then applied more direct pressure with the

Plaintiff, as Defendant recalls:

> Chief Anderson and I moved simultaneously.  He came across the bed and tried to
> grab one of the Plaintiff's arms and pull it from the bed.  I came across the foot of the
> bed, and grabbed the Plaintiff's other arm.  Chief Anderson and I tried unsuccessfully
> for several seconds to pry the Plaintiff's hands off of the headboard.  The Plaintiff was
> very strong and we were unable to get the Plaintiff's hands free.  Seeing that we were
> not going to be able to make the Plaintiff let go of the headboard by simply pulling on
> his arms, I attempted a nerve-strike technique I learned in the academy.  Using my
> fist, I struck twice at the Plaintiff's arms in the area of a nerve that is located on the
> forearm below the elbow.  A strike of sufficient force on the nerve will cause a
> temporary numbness that would have enabled us to pry the Plaintiff's hand loose.  My
> first strike was to the Plaintiff's left arm and he let go of the headboard with that arm.
> My second strike to the Plaintiff's right arm was unsuccessful as the Plaintiff
> maintained his hold on the bed with his right hand.[14]

In lieu of continuing to apply blunt force to no avail, Defendant, a certified TASER

instructor, resorted to that weapon with the direction and support of Chief Anderson, using only the

force necessary to subdue Plaintiff, as reflected by his testimony as follows:

> I withdrew my TASER, turned it on, aimed it at the Plaintiff and fired. *** I used the
> TASER with a cartridge on the front.  The cartridge fires two probes that are the
> equivlent of a straightened number 2 fishhook.  The probes are connected to the
> TASER by two thin wires that deliver electricity from the TASER, through the
> probes, and into the subject's body.  When the trigger is pulled on the TASER, in
> addition to firing the probes if a cartridge is attached, the device delivers a five-
> second discharge of electricity at .0036 amps.  The TASER will deliver the electricity
> for the full five-seconds, regardless of whether the user continues to depress the
> trigger.  The cycle can be interrupted by turning the TASER's safety on, and thus
> turning the TASER off.
>
> In this incident, I used a cartridge and depressed the trigger one time.  When I did so,
> the two probes from the TASER hit the Plaintiff in the upper left arm and left side.
> The Plaintiff received a five-second discharge from the TASER.  When the probes
> hit the Plaintiff, he finally turned loose on the headboard.  I instructed the Plaintiff

---

[14]*Id*. ¶¶ 56-59.

to lay down on his belly so he could be handcuffed.  The Plaintiff finally complied with my instructions and Chief Anderson put handcuffs on him.  ***

The Plaintiff did not put up any further struggle after he was handcuffed and I used no further force against him, other than to guide him by his arm to my patrol car, and eventually the ambulance.[15]

At the Andalusia Regional Hospital Emergency Room, Plaintiff had cream and a band-aid applied on each of his TASER wounds, and the report disclosed no injuries or abnormalities which required treatment. [16]  Though advised at the scene of his arrest on misdemeanor charges, Plaintiff was not taken to jail but instead released by ambulance from the hospital, after an hour or so, to the Laurel Oaks Behavioral Health Center for treatment between fourteen and eighteen days. Admission records included a diagram of the bodily wounds, described as two taser marks; four bruises – one on the right side of his neck, another on  his left knee, and two near the left center of his back; a forehead abrasion from a previous accident; two ½ inch cuts on his left hand from glass; a one-inch cut on his left forefinger from tin; and an old scar on his right knee.[17]  The misdemeanor charges – obstruction of governmental operations and resisting arrest – have not advanced to trial or otherwise been terminated.[18]

### III.   DISCUSSION

### A.   Standard of Review:  Excessive Force" and Qualified Immunity

---

[15] *Id*. ¶¶ 62, 66-70.

[16] *Ex*. M, 7/13/05, Andalusia Regional Hospital Records; Ex. D, N. Ainsworth Dep. at 86.

[17] Ex. N.

[18] *Def.'s Br*. at 24.

11

When a defendant properly asserts the defense of qualified immunity,[19] as Defendant has in this case,[20] judicial review sharpens in the first instance to the existence *vel non* of allegations which rise to the level of a constitutional violation;  as the Court expressed the inquiry  in *Saucier v. Katz*, 533 U.S. 194, 201 (2001):

> A court required to rule upon the qualified immunity issue must consider, then, this threshold question:  Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?...[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.  This inquiry...must be undertaken in light of the specific context of the case, not as a broad general proposition.

*See also Marsh v. Butler County*, 268 F.3d 1014, 1031-33 (11th Cir. 2001) (en banc).

The Fourth Amendment's protection against unreasonable searches and seizures includes an individual's right to be free from the use of excessive force.  A constitutional standard of "objective reasonableness", outlined in *Graham v. Connor*, 490 U.S. 386, 396 (1989),  "governs a free citizen's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of his person."  *Id.* at 388:

> Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," *Bell v. Wolfish*, 441 U.S. 520, 550 (1979), however, its proper application requires careful attention to the facts and circumstances of each particular case, including *the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.*

---

[19]Qualified immunity offers "complete protection for government officials sued in their individual capacities if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[20]*See* Answer to Plaintiff's Second Amended Complaint, Doc. 32, ¶ 2.

(*emphasis added*).  Assessing the reasonableness of the force in controversy must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citing Terry v. Ohio, 392 U.S. 1, 20-22 (1968)).

**B.**    **Excessive Force Analysis**

Plaintiff's complaint survived dismissal against Defendant's assertion of qualified immunity solely because it alleged that the Defendant deputy assaulted him gratuitously, with fists followed by a TASER, absent any provocation, resistance, legitimate law enforcement or other reasonably necessary purpose.  The well-documented and wholly undisputed evidentiary record establishes clearly and convincingly, however, the absence of any such assault.  Instead, it graphically portrays law enforcement officers' patient and reasonable efforts to restrain an indisputably mentally disturbed youngster whose suicide attempt and unrelenting belligerence threatened further harm to him, to his mother who summoned officers to the residence for just that purpose, and also to his father and brother frantically seeking to calm him.  Before applying physical force to any degree, Defendant – acting at all relevant times within his discretionary authority as a deputy sheriff–[21] made repeated though failed attempts to gain Plaintiff's confidence and cooperation.

Guided by relevant Eleventh Circuit case law established at the time, the court readily concludes that the minimal physical force and TASER strikes applied by Deputy Inabinett against Plaintiff fell well short of any constitutional violation.  The specific force he applied must be weighed against the totality of these relevant facts and circumstances:

---

[21]An officer asserting qualified immunity "must first prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991) (quoting *Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir. 1998)).

(1) Plaintiff's propensity for, and history of mental illness attended by violence;

(2) Plaintiff's history of suicidal behavior and actual attempts; Defendant's knowledge – through Plaintiff's past encounters with law enforcement officers – of Plaintiff's violent character;

(3) the fact that Plaintiff's mother summoned officers to quell what she observed as Plaintiff's uncontrollable, threatening, suicidal behavior, coupled with valid governmental/law enforcement interest in preventing suicides;

(4) the fact that the emergency line operator's telephone contact with Plaintiff's mother allowed her to monitor, and to receive reports on, Plaintiff's increasingly violent and threatening behavior as his family tried to calm him;

(5) the fact of the emergency line operator's radioed communications to summoned officers, including Defendant, of the Plaintiff's continuing violence;

(6) the fact that Defendant received a specific warning from radio dispatchers that Plaintiff threatened to harm officers and should be considered dangerous;

 (7) Plaintiff's actual, specific threats to Defendant in response to efforts to restrain him without the use of force coupled with Plaintiff's pledge to harm officers if they persisted in using force to restrain him;

(8) Defendant's efforts first to restrain Plaintiff by reasoning with him, next by applying strategic force with his hands, and only as a last resort, by firing the TASER only once for a five-second discharge;

(9) Defendant's two warnings to Plaintiff before using the TASER and his delay after each warning in order to solicit Plaintiff's cooperation;

14

(10) the fact that Defendant did not fire the TASER more than the single time
needed to subdue and handcuff Plaintiff; and

(11) the absence of any serious or permanent injuries to Plaintiff as a result of the
force applied, and evidence that the force left no injuries which required more than
a single minor examination and minimal treatment in the emergency room. [22]

Balancing the force in controversy with these several facts militates clearly in favor of Defendant on

the allegation of excessive force.  While no single factor is determinative, it bears noting that within

the Eleventh Circuit the use of a TASER is not alone evidence of excessive force.  See  *Draper v.*

*Reynolds*, 369 F.3d 1270 (11th Cir. 2004).[23]

In sum, the court concludes readily that the defendant deputy sheriff did not violate Plaintiff's

constitutional right to be free from excessive force because the force applied was not    "plainly

---

[22]*See*, e.g., *Nolin v. Isbell*, 207 F. 3d 1253, 1257 (11th Cir. 2000) (discussing *de minimis* injuries).

[23]As established on summary judgment submissions, the *Draper* facts reveal a belligerent truck driver who, after being stopped by an officer for a traffic infraction, became increasingly loud, profane, hostile, and obstinate, complaining of mistreatment and refusing after four requests to comply with the officer's request for certain documents.  On the fifth request the officer "promptly discharged his taser gun at Draper's chest", felling him,  and "threatened to discharge the taser gun again if Draper did not comply." 369 F.3d at 1273. Under those specific circumstances, the Eleventh Circuit held, in pertinent part:

> Reynold's use of the taser gun to effectuate the arrest of Draper was reasonably proportionate to the difficult, tense and uncertain situation that Reynolds faced in this traffic stop, and did not constitute excessive force.  From the time Draper met Reynolds at the back of the truck, Draper was hostile, belligerent, and uncooperative. . . .  [T]here was a reasonable need for some use of force in this arrest. . . . Although being struck by a taser gun is an unpleasant experience, the amount of force Reynolds used – a single use of the taser gun causing a one-time shocking - was reasonably proportionate to the need for force and did not inflict any serious injury.

*Id.* at  1278.

excessive, wholly unnecessary, [or] grossly disproportionate under *Graham*." *See Lee v. Ferraro*, 284 F.3d 1188, 1199(11th Cir. 2002) (denying qualified immunity on evidentiary finding of excessive force from officer's beating attack on handcuffed suspect who neither resisted nor attempted to flee)).

## IV.  CONCLUSION

Consistent with the foregoing *Memorandum Opinion*, it is

**ORDERED** as follows:

1.  Defendant's summary judgment motion (Doc. 37) is GRANTED;

2.  Judgment is GRANTED in favor of the Defendant, *Covington County Deputy Sheriff Chris Inabinett, in his individual capacity* and against the Plaintiff, *N.A., a minor who sues by and through Janet Ainsworth, his mother and next friend.*  All claims asserted are dismissed with prejudice,  and a separate Final Judgment is entered herewith;

3.  Costs are taxed against the Plaintiff; and

4.  The scheduled pretrial conference on October 12, 2006, and the scheduled jury trial on November 6, 2006, are each hereby cancelled.

Done this 20th  day of September, 2006.

**/s/ Delores R. Boyd**
DELORES R. BOYD
UNITED STATES MAGISTRATE JUDGE